MATT O'MALLEY (SBN 272802)
PATRICK MCDONOUGH (SBN 288285)
San Diego Coastkeeper
2825 Dewey Rd # 207
San Diego, CA 92106
Ph: 619-758-7743
Email: matt@sdcoastkeeper.org

COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA BORAK BEAUDIN (SBN 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
email: marco@coastlawgroup.com

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO COASTKEEPER, a non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation, <br><br> Plaintiffs, <br><br> v. <br><br> FREE BUILDERS SUPPLY INC., a California Corporation, <br><br> Defendant. | Civil Case No. **'21 CV1350 CAB MDD** <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. § 1251 _et seq._)** |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper ("Coastkeeper") (collectively "Plaintiffs"), by and through their counsel, hereby allege:

## I.      JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201.

2.      On or about May 21, 2021, Plaintiffs issued a 60-day notice letter ("Notice Letter") to Defendant Free Builders Supply Inc. ("Free Builders" or "Defendant"), as owner and operator of the Facility located at 1530 Linda Vista Drive, San Marcos, CA 92078 ("Facility"), regarding Defendant's violations of the Clean Water Act and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*), and *Order 2014-0057-DWQ as amended in 2015 and 2018* ("IGP"). True and correct copies of the Notice Letter and all enclosures are attached hereto as Exhibit 1 and incorporated herein.

3.      Plaintiffs also sent the Notice Letter to the registered agents for Defendant, the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the San Diego Regional Water Quality Control Board ("Regional Board") as required by 40 C.F.R. § 135.2(a)(1) and 33 U.S.C. § 1365(b)(1)(A).

4.      More than sixty (60) days have passed since the Notice Letter was served on Defendant and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and

in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

5.      Venue is proper in the Southern District of California pursuant to 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district.

## II.      INTRODUCTION

6.      Plaintiffs seek relief for Defendant's substantive and procedural violations of the IGP and the CWA resulting from its activities at the Facility.

7.      Specifically, Defendant has discharged and continues to discharge polluted storm water from the Facility to downstream waters including San Marcos Creek, Lake San Marcos, Batiquitos Lagoon, and the Pacific Ocean (collectively "Receiving Waters") in violation of the express terms and conditions of the Clean Water Act, 33 U.S.C. §§ 1301, 1342.

8.      Defendant has also violated and continues to violate the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the IGP. These are ongoing and continuous violations of the Clean Water Act and the IGP.

9.      With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial facilities like the Defendant's Facility flow into storm drain systems, local tributaries, and the Receiving Waters.

10.      Among the Receiving Waters are ecologically sensitive areas providing essential habitat for dozens of fish, hundreds of bird, and numerous mammal species, as well as vital macro- and micro-invertebrate species which are an important link in the food web between the producers (leaves, algae) and higher consumers such as fish.

11.      This discharge of polluted storm water and non-storm water from the Facility causes and/or contributes to the impairment of downstream Receiving Waters and compromises or destroys their Beneficial Uses.

12.      Storm water and non-storm water contaminated with sediment, heavy metals, nutrients, suspended and dissolved solids, and other pollutants harm the special

biological significance of the Receiving Waters. Discharges of polluted storm water and non-storm water to the Receiving Waters pose toxic, carcinogenic, and reproductive threats to the public and adversely affect the aquatic environment.

13.    The polluted discharges from the Facility also harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities, including Plaintiffs' members. The public's, including Coastkeeper's and CERF's members', use of the Receiving Waters for water contact recreation exposes people to toxic metals, carcinogenic chemicals, and other contaminants resulting from storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation and aesthetic enjoyment, are also impaired by polluted discharges, as such discharges cause or contribute to ecosystem and food web degradation.

### III.    PARTIES

14.    Free Builders Supply Inc., located at 1530 Linda Vista Drive, San Marcos, CA 92078, is an active California corporation, entity number C0694420, and is the Owner and/or Operator of the Facility.

15.    Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office in San Diego, California. Coastkeeper is committed to protecting and restoring the San Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's marine sanctuaries, coastal estuaries, wetlands and bays from illegal dumping, hazardous spills, toxic discharges, and habitat degradation.

16.    Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California with its office located in Encinitas, California. CERF was founded by surfers in North San Diego County and is active throughout California's coastal communities. CERF was established to advocate for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One

of CERF's primary areas of advocacy is water quality protection and enhancement.

17.   Many of Plaintiffs' members live and/or recreate in and around the Receiving Waters. Plaintiffs' members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife and scenery, and engage in scientific studies, among other activities.

18.   Defendant's failure to comply with the procedural and substantive requirements of the IGP and the CWA results in discharges of polluted storm water to the Receiving Waters. Defendant's polluted discharges degrade water quality and harm aquatic life in the Receiving Waters and thus impair Plaintiffs' members' use and enjoyment of those waters.

19.   The violations of the IGP and CWA at the Facility are ongoing and continuous. Thus, the interests of Plaintiffs' members have been and will continue to be adversely affected by Defendant's failure to comply with the IGP and the CWA.

20.   The relief sought herein will redress the harms to Plaintiffs' members caused by Defendant's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no other plain, speedy, or adequate remedy at law.

21.   An actual controversy exists as to the rights and other legal relations between Defendant and Plaintiffs.

## IV.   LEGAL BACKGROUND

### A.   The Clean Water Act.

22.   The CWA requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1).

23.   Section 301(a) of the Clean Water Act prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA.

24.   "Waters of the United States" are defined as "navigable waters" and "all

waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

25. The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

26. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *See* 40 C.F.R. § 122.2.

27. The CWA confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water.

28. The CWA requires all point source dischargers, including those discharging polluted storm water, achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 33 U.S.C. § 1311(b); 40 C.F.R. §§ 125.3(a)(2)(ii)–(iii).

**B.      California's IGP.**

29. Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. It allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.

30. California is a state authorized by the EPA to issue NPDES permits. In California, the State Board is charged with regulating pollutants to protect California's water resources. Cal. Water Code § 13001.

31. The IGP is a statewide general NPDES permit issued by the State Board pursuant to Section 402 that regulates the discharge of pollutants from industrial sites.

32. Between 1997 and June 30, 2015, the IGP in effect was *Order No. 97-03-DWQ* ("1997 Permit"). On July 1, 2015, pursuant to *Order No. 2014-0057-DWQ* ("2015

Permit"), the reissued 2015 IGP took effect. The 2015 Permit supersedes the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit. On July 1, 2020, pursuant to *Order 2014-0057-DWQ as amended in 2015 and 2018* ("2020 Permit"), the reissued 2020 IGP took effect.

33.    In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the IGP and comply with its terms or obtain and comply with an individual NPDES permit. 1997 Permit, Finding 2; 2015 & 2020 Permit § I.A.12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the IGP by submitting a Notice of Intent to Comply with the IGP ("NOI") to the State Board. 1997 Permit, Finding 3; 2015 & 2020 Permit § I.A.17.

34.    Violations of the IGP are violations of the Clean Water Act. 1997 Permit § C.1; 2015 & 2020 Permit § XXI.A.

**C.    The IGP Discharge Prohibitions.**

35.    The IGP contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this General Permit or another NPDES permit." 2015 & 2020 Permit § III.A.

36.    The Discharge Prohibitions forbid the direct or indirect discharge of liquids or materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. 2015 & 2020 Permit § III.B.

37.    These provisions further prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. 2015 & 2020 Permit § III.C.

38.    The IGP prohibits discharges that violate any discharge prohibitions contained in local Water Quality Control Plans ("Basin Plan") or statewide water quality control plans and policies. 2015 & 2020 Permit § III.D.

39.    The San Diego Basin Plan prohibits "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the

applicable receiving water quality objectives." Basin Plan at 4-20.

40.     Accordingly, where the discharge does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 Permits.

**D.     The IGP Effluent Limitations.**

41.     The IGP Effluent Limitation requires permittees to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of BAT and BCT. 2015 & 2020 Permit § V.A.

42.     Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include chemical oxygen demand ("COD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, nitrate + nitrite nitrogen ("N+N"), iron, and phosphorus, among others.

43.     Dischargers must develop and implement Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 2015 & 2020 Permit § V.A.

44.     EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). The Benchmarks provide a relevant and objective standard to determine whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); *see also* 2015 MSGP Fact Sheet at 50; 2021 MSGP Fact Sheet at 78-79.

45.     Failure to develop or implement BMPs that constitute BAT and BCT is an IGP violation. 33 U.S.C. § 1311(b); 2015 & 2020 Permit § V.A.

46.     The 2021 MSGP freshwater EPA Benchmarks include, but are not limited to: 100 mg/L for TSS; pH is 6.0–9.0 s.u; .68 mg/L for N+N; 1.1 mg/L for aluminum;

.00519 mg/L for copper; and .12 mg/L for zinc. 2021 MSGP Fact Sheet at 80-81.

**E.    The IGP Receiving Water Limitations.**

47.    The IGP Receiving Water Limitation prohibits storm water discharges and authorized non-storm water discharges from adversely impacting human health or the environment. 2015 & 2020 Permit § VI.B.

48.    Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the IGP's Receiving Water Limitations. *Id.*

49.    The IGP Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. 2015 & 2020 Permit § VI.A.

50.    Water quality standards ("WQSs") consist of both "designated uses" for a body of water and a set of "criteria" specifying the maximum concentration of pollutants that may be present in the water without impairing its suitability for designated uses. 33 U.S.C. § 1313(c)(2)(A).

51.    WQSs applicable to dischargers covered by the IGP include, but are not limited to, those set out in the Basin Plan, and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38. Both the CTR and Basin Plan WQSs must be attained at the point of discharge.

52.    The Basin Plan identifies designated "Beneficial Uses" for water bodies in the San Diego region under Clean Water Act section 303. 40 C.F.R. § 131.

53.    The Beneficial Uses for the San Marcos Creek downstream from the Facility include contact water recreation; non-contact recreation; warm freshwater habitat; wildlife habitat; and agricultural supply. Basin Plan, Table 2-2.

54.    The Beneficial Uses for Batiquitos Lagoon include contact water recreation; non-contact recreation; preservation of biological habitats of special significance; estuarine habitat; wildlife habitat; rare, threatened, or endangered species; marine habitat;

migration of aquatic organisms; and spawning, reproduction, and/or early development. *Id.*, Table 2-3.

55.    Pacific Ocean Beneficial Uses include: industrial service supply; navigation; contact water recreation; non-contact water recreation; commercial and sport fishing; wildlife habitat; preservation of biological habitats of special significance; marine habitat; migration of aquatic organism; spawning, reproduction, and/or early development; shell harvesting; aqua culture; and rare, threatened, or endangered species. *Id.*

56.    Surface waters that cannot support their Beneficial Uses are designated "impaired" water bodies pursuant to Section 303(d) of the Clean Water Act.

57.    According to the 2016 303(d) List, San Marcos Creek is impaired for benthic community effects, DDE, indicator bacteria, phosphorus, selenium, and toxicity.

58.    According to the Draft 2020-2022 Integrated Report and 303(d) List, which is based on existing, verified data from 2010-2019, Upper San Marcos Creek (above Lake San Marcos) is also impaired for nitrogen, total dissolved solids, bifenthrin, and pyrethroids.

59.    According to the Draft 2020-2022 Integrated Report and 303(d) List, which is based on existing, verified data from 2010-2019, Lower San Marcos Creek (below Lake San Marcos) is also impaired for nitrogen.

60.    According to the 2016 303(d) List, Lake San Marcos is impaired for ammonia as nitrogen, copper, nutrients, and phosphorus.

61.    According to the 2016 303(d) List, Batiquitos Lagoon is impaired for toxicity.

62.    Polluted discharges from industrial facilities, such as the Free Builders Facility, contribute to the degradation of these already-impaired surface waters, as well as aquatic-dependent wildlife.

63.    The following WQS are established by the Basin Plan for the San Marcos Creek: nitrogen, 1.0 mg/L; phosphorus, 0.1 mg/L; iron, 0.3 mg/L; manganese, 0.05 mg/L; TDS, 500 mg/L; pH "shall not be depressed below 6.5 or raised above 8.5." Basin Plan at

3-13; 3-26.

64.     The CTR includes numeric criteria set to protect human health and the environment. Based on 100mg/L hardness, the CTR maximum freshwater concentrations include: copper, 0.013 mg/L; and zinc, 0.12 mg/L. 40 C.F.R. § 131.38.

65.     Because the IGP Receiving Water Limitation prohibits discharges that cause or contribute to an exceedance of any applicable WQS, discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQSs, absent any authorized mixing or dilution zone, are violations of Receiving Water Limitations of the IGP. *See* 2015 & 2020 Permit § VI.A.

**F.      The IGP Storm Water Pollution Prevention Plan Requirements.**

66.     Prior to beginning industrial activities, dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). 2015 & 2020 Permit §§ X.A–B.

67.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. 1997 Permit § A.2; 2015 & 2020 Permit § X.

68.     The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the

frequency with which they are handled; a description of dust and particulate-generating activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan. 2015 & 2020 Permit §§ X.A–I.

69.     Dischargers must evaluate their SWPPP at least annually and revise it as necessary to ensure compliance with the IGP. 2015 Permit §§ I.J.55, X.A.9, X.B.1; 2020 Permit §§ I.K.69, X.A.9, X.B.1. The 2015 and 2020 Permits require dischargers to certify and submit via the Storm Water Multiple Application & Report Tracking System ("SMARTS") database their SWPPP within 30 days whenever the SWPPP contains significant revisions. 2015 & 2020 Permit § X.B.2.

70.     The IGP requires dischargers to conduct an annual comprehensive site compliance evaluation that includes, *inter alia*, a review of all visual observation records, sampling and analysis results, and a review and evaluation of all BMPs. 2015 & 2020 Permit § XV.

## G.     The IGP Monitoring and Reporting Requirements.

71.     Permittees must develop and implement a monitoring implementation plan ("MIP"). 2015 & 2020 Permit, §§ X.I, XI. The MIP objectives are to ensure BMPs have been adequately developed, implemented, and revised, and confirm compliance with the IGP's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 2015 Permit §§ I.J.55–56, X.I, XI; 2020 Permit §§ X.I, X, I.K.69–70.

72.     The MIP thus aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43; 2020 Permit Fact Sheet § J at 138.

73.     The IGP requires dischargers conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized non-storm water discharges. 2015 & 2020 Permit § XI.A.1.

74.     Section XI.B.1 of the 2015 and 2020 Permits require sampling from a

qualifying storm event ("QSE"), which is a precipitation event that produces a discharge for at least one drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area.

75.     The 2015 Permit defines Reporting Year as July 1 through June 30. 2015 Permit § I.M.62.b; 2020 Permit § I.N.76.b. Section XI.B.2 of the 2015 and 2020 Permits require dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each Reporting Year (July 1 to December 31), and two (2) QSEs within the second half of each Reporting Year (January 1 to June 30).

76.     Section XI.B.11 of the 2015 and 2020 Permits, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via the SMARTS database within thirty days of obtaining the results.

77.     The 2015 and 2020 Permits require dischargers to analyze samples for TSS, O&G, and pH, at a minimum. 2015 & 2020 Permits §§ XI.B.6.a–b.

78.     The 2015 and 2020 Permits require dischargers to analyze samples for other pollutants likely to be present in significant quantities in the storm water discharged from the facility that serve as indicators of the presence of all industrial pollutants. 2015 & 2020 Permits § XI.B.6.c.

79.     The 2015 and 2020 Permits also require dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved Total Maximum Daily Loads. 2015 & 2020 Permits § XI.B.6.e.

80.     The 2015 and 2020 Permits require dischargers to submit an annual report to the applicable Regional Board by July 15 of each year. The Annual report must include a (1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 Permit, (2) an explanation for any non-compliance of requirements within the Reporting Year (3) an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation.

81.    The IGP requires that all reports, certifications, or other information required by the Permit or requested by a regional board are signed by an authorized facility and certified for accuracy. 2015 & 2020 Permit § XXI.K.

## H.    The 2015 Permit Exceedance Response Actions Requirements.

82.    The 2015 Permit includes Numeric Action Levels ("NALs") that are based on EPA Benchmarks. Like Benchmarks, the NALs indicate "the overall pollutant control performance at any given facility." 2015 Permit § I.M.61; 2020 Permit § I.N.75; *see also id.* § I.M.62 and Table 2.

83.    When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status." 2015 & 2020 Permit § XII.B. A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. 2015 & 2020 Permit § XII.C.

84.    Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred. *Id*. By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of IGP ("Level 1 Evaluation"). 2015 & 2020 Permit §§ XII.C.1.a–c.

85.    Although the Level 1 Evaluation may focus on the drainage area(s) where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. 2015 & 2020 Permit § XII.C.1.c.

86.    Based upon the Level 1 Evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the Level 1 Evaluation, certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report prepared by a QISP that includes the summary of the Level 1 ERA

Evaluation, and a detailed description of the necessary SWPPP revisions, and any additional BMPs for each parameter that exceeded an NAL. 2015 &2020 Permit §§ XII.C.2.a.i–ii.

87.    The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. 2015 & 2020 Permit § XII.C.2.a.iii.

88.    A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive QSEs that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. 2015 & 2020 Permit § XII.C.2.b.

89.    A discharger's Level 1 status for any given parameter changes to Level 2 status if sampling results indicate a NAL exceedance for that same parameter while the discharger is in Level 1. Level 2 status commences on July 1 following the Reporting Year during which the NAL exceedance(s) occurred. 2015 & 2020 Permit § XII.D.

90.    Dischargers with Level 2 status shall certify and submit via SMARTS a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the Reporting Year during which the NAL exceedance(s) occurred.

91.    For each new Level 2 NAL exceedance, the Level 2 Action Plan must identify which of the demonstrations in subsection D.2.a–c the Discharger has selected to perform. A new Level 2 NAL exceedance is any Level 2 NAL exceedance for (1) a new parameter in any drainage area, or (2) the same parameter that is being addressed in an existing Level 2 ERA Action Plan in a different drainage area. 2015 & 2020 Permit § XII.D.1.a.

92.    The Discharger shall certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address)

if this information has changed since previous certifications. 2015 Permit & 2020 Permit § XII.D.1.b.

93.     The Level 2 ERA Action Plan shall at a minimum address the drainage areas with corresponding Level 2 NAL exceedances. 2015 Permit & 2020 Permit § XII.D.1.c.

94.     All elements of the Level 2 ERA Action Plan shall be implemented as soon as practicable and completed no later than 1 year after submitting the Level 2 ERA Action Plan. 2015 Permit & 2020 Permit § XII.D.1.d.

95.     The Level 2 ERA Action Plan shall include a schedule and a detailed description of the tasks required to complete the discharger's selected demonstration(s) as described in subsections D.2.a through c of the 2015 and 2020 Permits. 2015 Permit & 2020 Permit § XII.D.1.e.

96.     On January 1 of the Reporting Year following the submittal of the Level 2 ERA Action Plan, a discharger with Level 2 status shall certify and submit a Level 2 ERA Technical Report prepared by a QISP that includes one or more of the following demonstrations: (a) Industrial Activity BMPs Demonstration, (b) Non-Industrial Pollutant Source Demonstration, or (c) Natural Background Pollutant Source Demonstration. 2015 & 2020 Permit §§ XII.D.2.a–c.

97.     NAL exceedances as defined in the IGP are not, in and of themselves, violations of the IGP. However, NAL exceedances indicate that a facility is performing poorly and failing to implement BMPs that achieve BAT and BCT.

98.     A "[d]ischarger that does not fully comply with the Level 1 and/or Level 2 status ERA requirements, when required by the terms of this General Permit, is in violation of this General Permit." 2015 Permit § I.M.63; 2020 Permit § I.N.77.

## V.    FACTUAL BACKGROUND

### A.    Facility Site Information, Industrial Activities, and Pollutant Sources.

99.     California Secretary of State business records indicate the Facility has been operating since 1973.

100.    The Facility first submitted a Notice of Intent ("NOI") to obtain IGP

coverage under the IGP to conduct industrial operations on April 7, 2016, under Waste Discharge Identification Number 9 37I026525.

101.   According to the Facility's 2016 NOI, the Facility is 3.72 acres, 3.14 of which are industrial area exposed to storm water, and 98.6 percent of the Facility is impervious.

102.   Prior to Plaintiffs sending the Notice Letter to Defendant, the most recent Facility SWPPP publicly available via the SMARTS database was uploaded by the Facility on March 16, 2018 ("2018 SWPPP").

103.   According to the 2018 Facility SWPPP, the Free Builders Facility stores and sells concrete materials, building supplies, and mulch, as well as fabricates, stores, and sells rebar and other metal products. 2018 SWPPP § 1.2.

104.   The 2018 SWPPP lists the Facility Standard Industrial Classification ("SIC") codes as 3281 (Cut Stone and Stone Products), and 3449 (Miscellaneous Structural Metal Work), and 5251 (hardware store).

105.   Rebar is the primary structural metal fabricated, stored, sold, and otherwise used at the Facility. *Id*. § 2.3.

106.   Industrial activities conducted at the Facility include fabricating, welding, sawing, shearing, chiseling, hammering, machining, and grinding metals; storage, loading, and unloading of sand, dirt, mulch, gravel, concrete, rebar, wire mesh, other metal products, and other building materials; maintenance and repair of onsite equipment and transportation vehicles; and tire changing and tire storage. *See generally*, 2018 SWPPP; Regional Board Staff Enforcement Letter dated February 8, 2019 ("2019 SEL"); Facility's various Level 1 and Level 2 ERA Reports.

107.   Certain areas of the Facility are designated for specific industrial activities including the concrete products storage area, metal fabrication area, building material storage area, mulch storage area, sand and gravel storage area, truck storage area, tire changing area, vehicle and equipment maintenance area, and the wire mesh storage area. 2018 SWPPP § 2.3.

108.   According to the Facility SWPPP, industrial materials used and stored at the Facility include muriatic acid, acetylene, carbon dioxide, compressed gas, oxygen, top cast retarder, waste oil, Deck-o-seal base, lithochrome chemstain, Pro-tect water repellent and retarder, hydraulic fluid, silica sand, dirt, gravel, mulch, rebar, wire mesh, other metals, concrete products, tires.

109.   The 2019 SEL indicates that engine parts, vehicle batteries, industrial waste, rusting metal, and metal tailings and shavings are also present at the Facility.

110.   The 2018 SWPPP states the northern portion of the site, defined as Drainage Area 2, "is leased out to tenants for miscellaneous storage of materials and equipment." The 2018 SWPPP does not describe any activities or materials in Drainage Area 2, or assess the potential pollutant contribution from this area.

111.   According to the Facility's Level 2 ERA Technical Report for N+N dated August 2019 ("2019 Level 2 Technical Report"), the Facility stopped monitoring Drainage Area 2 in December 2017 "due to the area being leased to other tenants for miscellaneous storage of equipment."

112.   Multiple notices of violations and administrative citations from the City of San Marcos indicate that cabinetry manufacturing, stone cutting, and granite countertop manufacturing occur in Drainage Area 2.

113.   City of San Marcos inspections dated March 6, 2015 and April 23, 2015 found "granite powder and shavings all over the parking lot area," as well as "trash and debris" in Drainage Area 2.

114.   Following these inspections, the City of San Marcos directed Defendant to enroll under the IGP as such coverage is required for operations such as "mill and wood working (i.e. kitchen cabinets), cut stone and stone products (i.e. granite counters)," as well as metal processing and fabrication, and general warehousing & storage of such materials.

115.   The Regional Board contacted Free Builders on March 18, 2016 stating "[y]our facility conducts industrial activities that are subject to the Statewide Industrial

Storm Water General Permit Order 2014-0057-DWQ (IGP)," and that "SIC Codes 3281-Cut Stone, and, SIC Code 3449- Miscellaneous Structural Metal Work" apply to the Facility, including Drainage Area 2.

116.   The Facility's industrial activities and material contribute a variety of pollutants to its storm water and non-storm water discharges.

117.   According to the Facility SWPPP, certain areas of industrial activity at the Facility are associated with specific storm water pollution threats.

118.   The concrete products storage area can contribute pH affecting substances. 2018 SWPPP, Tables 2-2 & 3-4.

119.   The metal fabrication area can contribute aluminum, iron, zinc, N+N, and TSS. *Id.*

120.   The building materials area can contribute pH affecting substances and TSS; the mulch storage area can contribute N+N and TSS. *Id.*

121.   The maintenance area can contribute O&G, aluminum, iron, zinc, and TSS; the sand and gravel storage area can contribute N+N and TSS. *Id.*

122.   The truck storage area can contribute O&G, aluminum, iron, zinc, and TSS. *Id.*

123.   The tire changing area can contribute O&G, aluminum, iron, zinc, and TSS. *Id.*

124.   The wire mesh storage area can contribute aluminum, iron, and zinc. *Id.*

125.   The SWPPP also acknowledges that "metal fabrication processes are known to create airborne contaminants and particulates including grinding dust, welding smoke, and machining oil mist," and "[s]tock piles of raw material including sand, gravel, dirt, [and] mulch, can generate dust during the loading and unloading of the material." *Id.* § 2.2. This dust can then settle on impervious surfaces throughout the Facility, and be mobilized by storm water.

126.   The Facility's Level 1 Exceedance Response Action Report, dated March 14, 2017 (hereinafter "2017 Level 1 Report"), also identifies the following potential

pollutant sources at the Facility: TSS and N+N from loading and unloading various industrial materials in the sand and gravel storage area; TSS, aluminum, zinc, and iron from cutting and grinding activities in the metal fabrication area; aluminum, zinc, and iron from the maintenance and wire mesh storage areas; zinc from the tire changing area; and TSS, N+N, aluminum, zinc, and iron from the miscellaneous tenant storage area in Drainage Area 2, all of which the 2017 Level 1 Report acknowledge as industrial sources. 2017 Level 1 Report § 5.0.

127.    The 2017 Level 1 Report further observed "a significant amount of sediment" accumulating at Outfall 1; "[l]arge amounts of metal debris and fragments" throughout the metal fabrication area; sand and gravel dispersed on the ground outside of the designated storage areas; "what appeared to be oil and hydraulic fluid staining" at the maintenance and metal fabrication areas"; and various raw metal materials stored outside on racks exposed to storm water. *Id*. §§ 6.0, 7.0.

128.    The Regional Board identified "[m]ultiple areas of exposed industrial activity, materials, and waste" which could contribute to pollutants in the Facility's storm water discharges. 2019 SEL.

129.    "Materials and wastes of concern include engine parts, vehicle batteries, and outdoor storage of industrial materials," "overflowing uncovered waste container (dumpster)," and "[t]rack-out of materials by vehicles." *Id*.

130.    The 2019 SEL also found that many BMPs described in the Facility's various storm water management documents were not, in fact, fully implemented.

131.    Multiple notices of violations and administrative citations issued by the City of San Marcos further identify numerous "areas of concern" regarding storm water regulatory compliance deficiencies, particularly in Drainage Area 2.

132.    Photos and notes from City of San Marcos Stormwater Program inspections conducted on March 6, 2015; April 23, 2015; August 4, 2015; September 30, 2015; December 7, 2015; and March 2, 2016 evidence "granite powder and shavings all over the parking lot area," "trash and debris," piles of sediment, storage of scrap metal and

rusting metal, inadequate storage and containment of hazardous substances, and improper handling of solid waste and other materials.

133.   The notices of violations and administrative citations from the City of San Marcos all stated the Facility failed to comply with various municipal codes as well as provisions of the IGP.

134.   As the Facility SWPPP acknowledges, pursuant to Facility's SIC code 3449, corresponding to miscellaneous structural metal work, the IGP requires that in addition to the TSS, O&G, and pH, the Facility must sample for N+N, zinc, iron, and aluminum as these pollutants are commonly present at facilities engaged in various metal fabrication activities. 2015 & 2020 Permit, Table 1.

135.   The Facility's own storm water monitoring data establishes that the Facility frequently discharges high concentrations of aluminum, iron, zinc, N+N, TSS, and pH, in excess of applicable water quality standards and EPA benchmarks promulgated to protect human health and the environment. Ex. 1, Facility's storm water sampling data.

136.   A storm water sample collected from the Facility by CERF on December 28, 2020 shows concentrations of iron, zinc, copper, manganese, N+N, and phosphorus in excess of such water quality objectives, benchmarks, and other standards. Ex. 1, CERF sampling data.

137.   Based on the Facility's SWPPPs, site maps, inspection records, photos, the 2019 SEL, direct observations, and other documentation, Plaintiffs are informed, believe, and thereon allege that industrial activities occur, and industrial materials are handled, at various locations throughout the Facility either outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and/or without adequate secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility.

138.   Based on the Facility's SWPPPs, site maps, inspection records, photos, the 2019 SEL, direct observations, and other documentation, Plaintiffs are informed, believe, and thereon allege that many pollutants associated with industrial activities occurring

indoors or under partial shelter at the Facility regularly escape via dust emissions, wind dispersion, vehicle track out, or otherwise, resulting in pollutant dispersal throughout the Facility.

139.   Based on the Facility's SWPPPs, site maps, inspection records, photos, the 2019 SEL, direct observations, and other documentation, Plaintiffs are informed, believe, and thereon allege that pollutants associated with the Facility's industrial activities have been and continue to be tracked by vehicles and dispersed via wind throughout the entire site, and on and off the Facility through ingress and egress. This results in trucks and vehicles tracking pollutants off-site, and aerial deposition of pollutants throughout the Facility as well as offsite.

140.   Based on the Facility's SWPPPs, site maps, inspection records, photos, the 2019 SEL, direct observations, and other documentation, Plaintiffs are informed, believe, and thereon allege that one or more regulated industrial activities are conducted at locations throughout the entire Facility, and thus the entire Facility requires IGP coverage.

141.   Plaintiffs are informed, believe, and thereon allege that even if regulated industrial activities are not conducted at all locations throughout the entire Facility, BMPs or other controls do not adequately separate the storm water flows from portions of the Facility where non-regulated activities may occur from storm water flows from the regulated industrial activities.

142.   Plaintiffs are informed, believe, and thereon allege that, due to both the Facility's lack of BMPs, and inadequacy of existing BMPs, storm water from areas of the Facility where industrial activities are conducted commingles with storm water from other areas of the Facility, and wash water, process water, and other non-storm water commingle with storm water, and thus all discharges from the Facility are regulated under the IGP.

143.   Plaintiffs are informed, believe, and thereon allege that industrial activities at the Facility generate significant amounts of numerous pollutants. During rain events,

these pollutants are washed off surfaces throughout the facility and into storm water discharge points, which flow to Receiving Waters.

144.   Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continues to fail to develop and/or implement required BMPs to prevent discharges of all non-storm water in violation of the IGP and the Clean Water Act.

145.   Plaintiffs are informed, believe, and thereon allege that Defendant has discharged and continues to discharge polluted storm water and non-storm water from the Facility in violation of the IGP.

146.   Plaintiffs are informed, believe, and thereon allege that the Facility's polluted discharges have caused and/or contributed, and continue to cause and/or contribute, to the impairment of water quality in Receiving Waters in violation of the IGP.

147.   Plaintiffs are informed, believe, and thereon allege that elevated levels of numerous pollutants have resulted in the inability of Receiving Waters to support their Beneficial Uses.

148.   Plaintiffs are informed, believe, and thereon allege that the illegal discharges of polluted storm water and non-storm water from the Facility impact Coastkeeper and CERF's members' use and enjoyment of the Receiving Waters by degrading the quality of those waters, and by posing risks to human health and aquatic life.

**B.   Facility Drainage Areas, Storm Water Flow, and Discharge Locations.**

149.   The Facility is bordered to the west, north, and east by various industrial and commercial operations, and to the south by Linda Vista Drive.

150.   According to the 2018 SWPPP, Drainage Area 1 encompasses 87 percent of the Facility's footprint. All of the industrial activities, materials, and areas of specific industrial activities addressed in Free Builder's SWPPP, including metal fabrication area, concrete and building materials storage, maintenance area, main office, sales office, and a customer parking area, are all located within Drainage Area 1.

151.   According to the 2018 SWPPP, the paved customer parking area at the

southern end of the Facility has no exposure to industrial activities or materials.

152.   The majority of storm water flows from Drainage Area 1 sheetflow southeast across the site, through a gravel check damn, ultimately discharging at the southeast corner of the Facility toward Linda Vista Drive at Outfall 1.

153.   According to the 2018 SWPPP, Drainage Area 2 is "leased out to tenants for miscellaneous storage of materials and equipment," and "no industrial operations are conducted in this area." 2018 SWPPP § 1.4. Storm water flows from Drainage Area 2 discharge to the east toward S. Pacific Street, and discharge at Outfall 2.

154.   Storm water discharges from both Outfall 1 and Outfall 2 enter the City of San Marcos municipal separate storm sewer system ("MS4"), and thereafter flow to San Marcos Creek, Lake San Marcos, Batiquitos Lagoon, and ultimately the Pacific Ocean.

155.   Plaintiffs are informed, believe, and thereon allege the Facility's lacks any storm water retention capacity, and that as such, the Facility will discharge storm water during almost all QSEs.

**C.   The Facility Discharges Contaminated Storm Water in Violation of the IGP.**

156.   Plaintiffs are informed, believe, and thereon allege that with every significant rain event, the Facility discharges polluted storm water via storm drainage systems into the Receiving Waters.

157.   Plaintiffs are informed, believe, and thereon allege that the Receiving Waters into which the Defendant discharges polluted storm water are waters of the United States and therefore the IGP properly regulates discharges to those waters.

158.   Plaintiffs are informed, believe, and thereon allege that storm water and non-storm water discharges from the Facility violate the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations of the IGP.

**1.   Discharges of Polluted Storm Water from the Facility Violate IGP Discharge Prohibitions.**

159.   The Facility has discharged unauthorized non-storm water discharges

("NSWD") in violation of the IGP. *See* 2015 & 2020 Permit § III.B.

160.    During the Regional Board's January 25, 2019 inspection, an "unknown non-stormwater discharge (NSWD) was seen leaving the industrial area of the facility." 2019 SEL.

161.    Photos from the 2019 SEL support this observation, showing NSWDs from the concrete products storage area, as well as evidence of track out.

162.    The 2019 SEL further explained that "[f]ailure to implement minimum good housekeeping BMPs to ensure that all facility areas impacted by rinse/wash waters are cleaned as soon as possible and that prevent disposal of any rinse/wash waters or industrial materials into the storm water conveyance system are violations of Sections X.H.1.a.iv and X.H.1.a.vii of the [IGP]."

163.    Multiple images from Google Earth, spanning from November 2016 to August 2019, show NSWDs draining from the concrete products storage area, as well as evidence of track out and staining from persistent NSWDs, indicating that such NSWDs are a persistent issue.

164.    Plaintiffs are informed, believe, and thereon allege Defendant has failed to develop and/or implement BMPs that would prevent NSWDs from comingling and/or discharging from the Facility in violation of the IGP. *See* 2015 & 2020 Permits § III.B.

165.    Each time Defendant discharges prohibited non-storm water in violation of Discharge Prohibition III.B. of the Permit is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

166.    Plaintiffs are informed, believe, and thereon allege that the Facility has discharged and continues to discharge pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of IGP. *See* 2015 & 2020 Permit § III.C.

167.    The California Water Code defines "contamination" as "an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease."

168.   "Pollution" is defined as "an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial uses."

169.   The Facility's own storm water monitoring data demonstrates the Facility has discharged, and continues to discharge, concentrations of aluminum, iron, zinc, N+N, TSS, and pH in excess of various water quality objectives, benchmarks, and other standards which were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters. *See* Ex. 1, Facility's Monitoring Data.

170.   A storm water sample collected from the Facility by CERF on December 28, 2020 also shows concentrations of iron, zinc, copper, manganese, N+N, and phosphorus in excess of such water quality objectives, benchmarks, and other standards. *See* Ex. 1, CERF sampling data.

171.   Waste Discharge Prohibition number 5 of the San Diego Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited."

172.   "Waste" is defined as, "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation," which includes discharges of pollutants in storm water. California Water Code, § 13050(d).

173.   Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 IGP.

174.   Plaintiffs are informed, believe, and thereon allege that no express allowance for dilution has been granted to the Facility's discharges or to the downstream Receiving Waters.

175.   Plaintiffs are informed, believe, and thereon allege the Defendant has violated and continues to violate Discharge Prohibition III.D of the 2015 and 2020 Permits by discharging pollutants in excess of water quality objectives listed in the San

Diego Basin Plan, and other "statewide water quality control plans" such as the CTR. *See generally* Basin Plan Chapter 3; *see also* 40 C.F.R. § 131.38.

176.   The Facility's own storm water monitoring data shows numerous instances of concentrations of iron, nitrogen, TSS, and pH far in excess of respective Basin Plan Water Quality Objectives, and concentrations of zinc in excess of the CTR standard. Ex. 1, Facility's Monitoring Data.

177.   The sampling data collected by CERF on December 28, 2020 shows concentrations of iron, manganese, nitrogen, and phosphorus in excess of the Basin Plan's objectives, concentrations of copper in excess of the CTR standard. Ex. 1, CERF sampling data.

178.   Thus, the Facility has discharged and continues to discharge numerous pollutants in concentrations exceeding water quality objectives in violation of Discharge Prohibition III.D.

179.   Each time the Facility discharges polluted storm water in violation of Sections III.B, III.C, or III.D of the Discharge Prohibitions provisions of the IGP is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

180.   These Discharge Prohibition violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that prevent such discharges.

### 2.  Discharges of Polluted Storm Water from the Facility Violate IGP Effluent Limitations.

181.   Defendant has failed and continues to fail to develop and/or implement BMPs as required to achieve compliance with the BAT/BCT standards to prevent the discharge of polluted storm water from the Facility. *See* 2015 & 2020 Permit § V.A.

182.   The Facility's own storm water monitoring data demonstrates that the Facility's storm water discharges frequently exceed the EPA benchmarks for aluminum, iron, zinc, N+N, TSS, and pH.

183.   On March 10, 2020, the Facility discharged concentrations of aluminum at 11 mg/L exceeding the benchmark of 1.1 mg/L; iron at 2.2 mg/L exceeding the 2015 benchmark of 1.0 mg/L; zinc at 0.33 mg/L exceeding the benchmark of 0.12 mg/L; TSS at 270 mg/L exceeding the benchmark of 100 mg/L; and pH at 9.24 S.U. exceeding the benchmark of 9.0 S.U. Ex. 1, Facility's Monitoring Data.

184.   The Facility's sample from December 23, 2019 indicates the Facility discharged N+N at a concentration of 1.8 mg/L exceeding the benchmark of 0.68 mg/L. *Id*.

185.   The analytical results from the storm water samples collected by CERF on December 28, 2020 further demonstrate the Facility's discharges contained concentrations of iron, copper, zinc, N+N, and phosphorus in excess of EPA Benchmarks. These results showed concentrations of iron at 3.23 mg/L exceeding the 2015 benchmark of 1.0 mg/L, zinc at 0.274 mg/L exceeding the benchmark of 0.12 mg/L, N+N at 1.55 mg/L exceeding the benchmark of 0.68 mg/L, copper at 0.044 mg/L exceeding the benchmark of 0.00519 mg/L, and phosphorus at 2.01 mg/L exceeding the benchmark of 2.0 mg/L.

186.   Each time Defendant discharges polluted storm water in violation of Effluent Limitation B.3 of the 1997 Permit and Effluent Limitation V.A of the 2015 and 2020 Permits is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These effluent limitation violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

187.   Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation of these Effluent Limitations since May 21, 2016 and is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

### 3.  Discharges of Polluted Storm Water from the Facility Violate IGP Receiving Water Limitations.

188.    Plaintiffs are informed, believe, and thereon allege that the Facility has violated and continues to violate IGP Receiving Water Limitations.

189.    Storm water monitoring data collected by both CERF and the Facility demonstrates the Facility has discharged iron, manganese, nitrogen, phosphorus, TSS, and pH in excess of respective Basin Plan Water Quality Objectives. *See* Ex. 1. The data also demonstrates the Facility has discharged storm water with concentrations of zinc and copper in excess of their respective CTR standards. *Id*.

190.    As explained *supra*, the Receiving Waters are impaired, and thus unable to support designated Beneficial Uses, for some of the same pollutants discharged by the Facility.

191.    San Marcos Creek is impaired for phosphorus and nitrogen. Lake San Marcos is impaired for phosphorus, nutrients, and ammonia as nitrogen.

192.    Storm water samples collected from the Facility on December 28, 2020 show concentrations of phosphorus at 2.01 mg/L, far exceeding the Basin Plan Water Quality Objective of 0.1 mg/L. *Id*.

193.    On numerous occasions the Facility has discharged N+N, which only constitutes a subset of total nitrogen, in excess off the Basin Plan Water Quality Objective.

194.    Excess concentrations of nutrients such as phosphorus and nitrogen can reduce levels of dissolved oxygen and cause hypoxia or harmful algal blooms that can create toxins. Such toxins can move up the food chain. U.S. EPA, *Nutrient Pollution, The Effects: Environment*, https://www.epa.gov/nutrientpollution/effects-environment *(last updated Apr. 15, 2019)*.

195.    High nitrogen and phosphorus loadings also result in reduced spawning grounds and nursery habitats, fish kills, and public health concerns related to impaired drinking water sources and increased exposure to toxic microbes. U.S. EPA, *Memorandum, Nutrient Pollution and Numeric Water Quality Standards* (May 5, 2007) https://www.epa.gov/sites/production/files/2014-08/documents/nutrient-memo-

1  may252007.pdf.

2      196.   The Facility's polluted discharges cause and/or contribute to San Marcos

3  Creek's and Lake San Marcos's nutrient-related impairments.

4      197.   Lake San Marcos is also impaired for copper.

5      198.   San Marcos Creek and Batiquitos Lagoon are impaired for toxicity.

6      199.   While the Facility has never analyzed its storm water samples for copper, the

7  sample collected by CERF on December 28, 2020 indicate a copper concentration of

8  0.044 mg/L, exceeding the CTR standard of 0.013 mg/L. Ex. 1.

9      200.   The Facility's own storm water monitoring data indicates numerous

10  instances of zinc concentrations exceeding the CTR standards of 0.12 mg/L. *Id*.

11      201.   Copper and zinc are highly toxic pollutants in aquatic environments, and

12  limitations on such toxic pollutants are specifically enumerated in the CTR. 40 C.F.R. §

13  131.38.

14      202.   The Facility's discharges of these toxic metals in excess of the CTR

15  standards cause and/or contribute to Lake San Marcos's copper impairment, and the

16  toxicity impairments of San Marcos Creek and the Batiquitos Lagoon.

17      203.   Because the Basin Plan and CTR are applicable WQSs under the IGP, the

18  Facility's ongoing storm water discharges containing concentrations of pollutants in

19  excess of applicable WQSs, which cause and/or contribute to respective impairments of

20  Receiving Waters, violate the Receiving Water Limitations of the IGP. 2015 & 2020

21  Permits § VI.A.

22      204.   Plaintiffs are informed, believe, and thereon allege that discharges of

23  elevated concentrations of pollutants from the Facility also adversely impact human

24  health, thus violating the Permit Receiving Water Limitation VI.B of the 2015 and 2020

25  Permits.

26      205.   Each time Defendant discharges polluted storm water in violation of the

27  IGP's Receiving Water Limitations is a separate and distinct violation of the IGP and

28  Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

206.   Plaintiffs are informed, believe, and thereon allege that the Facility's discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the IGP's Receiving Water Limitations.

207.   Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation since May 21, 2016 and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

**D.   Defendant Has Violated and Continues to Violate IGP SWPPP Requirements.**

208.   Plaintiffs are informed, believe, and thereon allege that Defendant has conducted operations at the Facility with an inadequately developed and/or implemented SWPPP and site map.

209.   According to the Facility SWPPP, "no industrial operations are conducted" in Drainage Area 2, and that this area is "leased out to tenants for miscellaneous storage of materials and equipment." 2018 SWPPP § 1.4.

210.   Numerous inspection photos, notices of violations, and administrative citations from the City of San Marcos demonstrate that industrial activities take place in Drainage Area 2 such as storage of numerous industrial materials, cabinetry operations, and granite countertop activities.

211.   Numerous notices and administrative citations from the City of San Marcos specifically state that this drainage area, and these activities, require coverage under the IGP.

212.   On March 18, 2016, the Regional Board informed the Facility that it conducts industrial activities that are subject to the IGP, including the activities and operations conducted in Drainage Area 2.

213.   As such, Plaintiffs are informed, believe, and thereon allege the Facility SWPPP and site map fail to address Drainage Area 2 in violation of the IGP's SWPPP requirements.

214.   Plaintiffs are informed, believe, and thereon allege that Defendant has failed

to develop and/or implement BMPs that adequately: minimize the exposure of pollutants to storm water at the Facility; control and minimize polluted runoff from the Facility; treat and remove pollutants in storm water prior to discharge; prevent or control contaminated storm water from being discharged from the Facility; and prevent or control contaminated NSWDs from being discharged from the Facility.

215.   While the Facility's various ERA action plans and technical reports identify BMPs such as exposure minimization, housekeeping practices, and other controls to reduce pollutants in storm water discharges, based on the Regional Board's January 25, 2019 inspection, many of these identified BMPs are not being implemented in violation of the IGP. *See* 2019 SEL.

216.   This 2019 SEL identified, with supporting photos, "[m]ultiple areas of exposed industrial activity, materials, and waste," including "rusted materials with evidence of pollutant mobilization during storm events," "[a]ccumulated sediment from stockpiles being tracked out of the facility by vehicles," and "engine parts, vehicle batteries, and outdoor storage of industrial materials," all of which could contribute pollutants to the Facility's storm water discharges.

217.   The 2019 SEL explained that such "[i]mproperly managed and stored materials and wastes require corrective actions," and that materials and wastes exposed to storm water without implementation of minimum BMPs is a violation of Section X.H of the IGP.

218.   Specifically, the SEL identified an uncovered industrial dumpster in violation of Section X.H.1.d.iii; failure to implement BMPs to prevent trackout in violation of Section X.H.1.a.ii; and NSWDs flowing out of the industrial area indicating the Facility failed "to implement minimum good housekeeping BMPs to ensure that all facility areas impacted by rinse/wash waters are cleaned as soon as possible and that prevent disposal of any rinse/wash waters or industrial materials into the storm water conveyance system are violations of Sections X.H.1.a.iv and X.H.1.a.vii" of the IGP.

219.   Defendant responded to the 2019 SEL on March 15, 2019 and described

1    certain corrective actions.

2    220.   Plaintiffs are informed, believe, and thereon allege that Defendant's

3    response to the 2019 SEL failed to adequately address all of the violations.

4    221.   Defendant's response included several of photos cited as evidence of

5    corrections, but which demonstrate ongoing violations, poor housekeeping, and

6    insufficient BMPs.

7    222.   Furthermore, stormwater data collected by both the Facility and CERF after

8    March 15, 2019 shows consistently high levels of pollutants in exceedance of applicable

9    WQSs and benchmarks, indicating the Facility's BMPs continue to fail to adequately (1)

10   minimize pollutant exposure to storm water at the Facility; (2) control and minimize

11   polluted runoff from the Facility; (3) treat and remove pollutants in storm water prior to

12   discharge; (4) prevent or control contaminated storm water from being discharged from

13   the Facility; or (5) prevent or control contaminated NSWDs from being discharged from

14   the Facility, all of which violate the IGP.

15   223.   Plaintiffs are informed, believe, and thereon allege that the Facility SWPPP

16   fails to adequately analyze the effectiveness of the Facility's existing BMPs.

17   224.   Plaintiffs are informed, believe, and thereon allege that the inadequacy of the

18   BMPs at the Facility is in part a result of Defendant's failure to develop, implement, and

19   revise an adequate SWPPP.

20   225.   Plaintiffs are informed, believe, and thereon allege the Facility's ongoing

21   failures to implement adequate BMPs violates numerous provisions of the IGP's SWPPP

22   requirements including, but not limited to, Sections X.H.1.a.ii, X.H.1.a.iv, and

23   X.H.1.a.vii.

24   226.   Plaintiffs are informed, believe, and thereon allege the 2018 SWPPP

25   erroneously claims the customer parking lot located at the southern end of the site has

26   "no exposure to industrial activities or materials." *See* 2018 SWPPP § 1.4.

27   227.   Applicable regulations state that areas of industrial activity include

28   "immediate access roads and rail lines used or traveled by carriers of raw materials,

manufactured products, waste material, or by-products used or created by the facility." 40 C.F.R. § 122(b)(14); *see also* 2015 & 2020 Permits, Attachment C, Glossary.

228.   As driveways through the southern part of the Facility are the only ingress and egress points to all of the industrial materials used and stored in Drainage Area 1, they are both immediate access roads through which numerous industrial materials regularly traverse, and are thus subject to the IGP.

229.   Defendant failed to produce and implement the Facility SWPPP by July 1, 2015, as required by the IGP.

230.   Free Builders finally enrolled for IGP coverage and submitted a Facility SWPPP to the SMARTS database on April 6, 2016, over nine months after the Permit's deadline, and only after numerous notices of violations and citations from the City of San Marcos, and instruction from the Regional Board.

231.   Defendant has failed to revise the Facility's SWPPP to ensure compliance with the IGP. *See* 2015 & 2020 Permits, § X.B.

232.   Despite the significant concentrations of pollutants in the Facility's storm water discharges each year, the Facility SWPPP has remained the same since March 16, 2018, and thus has not been revised to include additional BMPs to eliminate or reduce these pollutants, as required by the IGP.

233.   The Regional Board's 2019 SEL noted the 2018 SWPPP failed to reflect updates and BMPs identified in the Facility's Level 2 ERA Technical Reports, which were published well after March 16, 2018, in violation of the IGP.

234.   Despite the Regional Board's instructions, Defendant failed to revise the Facility SWPPP.

**E.**   **Defendant Has Failed to Develop, Implement, and/or Revise Adequate Monitoring Implementation Plan at the Facility.**

235.   Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed, implemented, and/or revised MIP.

236.   Defendant has failed and continues to fail to develop and/or implement a

MIP that ensures the collection of storm water samples "from each drainage area at all discharge locations" in violation of Section XI.B.4 of the IGP.

237.   While Section XI.C.4 of the Permit allows permittees to reduce the number of locations to be sampled, there is no indication Defendant has complied with the requirements of Section XI.C.4 to justify sampling a reduced number of discharge locations at the Facility.

238.   Defendant has failed and continues to fail to collect samples from Drainage Area 2 in violation of the IGP.

239.   Defendant failed and continues to fail to collect the required number of storm water samples for each reporting period.

240.   Although the IGP requires facilities to collect four samples each reporting period, Defendant collected only one sample during each of the 2016–2017 and 2018–2019 reporting periods, and only two samples during the 2015–2016 and reporting periods.

241.   Numerous QSEs occurred during each reporting period. *See* Exhibit 1, Precipitation Data.

242.   The Facility lacks any storm water retention capacity.

243.   The Facility therefore discharges storm water from each drainage area during each QSE.

244.   The Facility's SWPPP, site map, MIP, and annual reports fail to adequately explain why the Facility failed to collect four samples each reporting period.

245.   Defendant's failure to collect the required number of storm water samples during each reporting period violates the IGP.

246.   Defendant has failed and continues to fail to sample and analyze storm water discharges for all parameters required by the IGP.

247.   Plaintiffs are informed, believe, and thereon allege Defendant's industrial activities and materials contribute significant amounts of both copper and phosphorus to the Facility's storm water discharges.

248.   The storm water sample collected by CERF on December 28, 2020 shows concentrations of copper at 0.044 mg/L exceeding the CTR standard of 0.013 mg/L, and phosphorus at 2.01 mg/L exceeding the Basin Plan Objective of 0.1 mg/L.

249.   Defendant has failed to analyze its own storm water discharges for these parameters.

250.   Receiving Waters are impaired for these same pollutants. Marcos Creek is impaired for phosphorus, nitrogen, and toxicity. Lake San Marcos is impaired for phosphorus, copper, and nutrients. Batiquitos Lagoon is impaired for toxicity.

251.   Defendant's failure to analyze storm water samples for copper and phosphorus violates the IGP. *See* 2015 & 2020 Permits §§ XI.B.6.c; XI.B.6.e.

252.   The IGP requires dischargers to conduct visual observations of storm water discharges, of authorized and unauthorized NSWDs, and of BMPs.

253.   Based on information available to Coastkeeper and CERF, including the Facility's repeated violations of Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations, and failure to collect the required number of storm water samples, the Plaintiffs allege Defendant fails to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

**F.     Defendant Has Violated the IGP's Reporting Requirements.**

254.   The 2015 Permit requires Permittees to submit all sampling and analytical results for all samples via SMARTS within thirty days of obtaining all results for each sampling event. 2015 & 2020 Permits § XI.B.11.a.

255.   Defendant failed to comply with these reporting requirements. For example, Defendant uploaded storm water sampling lab reports dated March 26, 2020 and April 27, 2020, on June 12, 2020, over thirty days after they were received.

256.   Defendant has failed to submit Annual Reports that comply with the IGP reporting requirements. *See* 2015 & 2020 Permits § XVI.

257.   In each Annual Report, Defendant must certify that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the IGP; (2)

the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the IGP, or will otherwise be revised to achieve compliance.

258.   The Facility's SWPPPs do not include many elements required by the IGP, and thus Defendant's certification to the 2019–2020 Annual Report is erroneous, and constitutes a violation of the IGP and CWA.

### G.   Defendant Has Violated the IGP's ERA Provisions.

259.   Defendant has failed to comply with several of the IGP's ERA requirements.

260.   The Facility's storm water monitoring data from the 2015–16 reporting period shows the Facility exceeded the annual NALs for TSS, aluminum, iron, zinc, and N+N. As such, the Facility entered Level 1 status for the aforementioned parameters on July 1, 2016.

261.   Defendant failed to complete a Level 1 ERA evaluation by October 1, 2016, as required by Section XII.C.1 of the Permit.

262.   Defendant failed to submit a Level 1 ERA report, complete SWPPP revisions, and implement any BMPs identified in the evaluation by the statutory deadline of January 1, 2017. *See* 2015 & 2020 Permits § XII.C.2.

263.   Storm water monitoring data demonstrates the Facility has continued to discharge pollutants in excess of applicable NALS, and thus the Facility's Level 1 ERA Report failed to identify and implement BMPs "necessary to prevent future NAL exceedances and to comply with the requirements of the General Permit." *See* 2015 & 2020 § XII.C.1.c.

264.   The Facility's storm water monitoring data from the 2016–17 reporting period shows the Facility again exceeded the annual NALs for iron, aluminum, and zinc, and as such the Facility entered Level 2 for these parameters as of July 1, 2017.

265.   Defendant submitted a Level 2 ERA Action Plan on December 28, 2017 ("2017 Level 2 Action Plan") for iron, aluminum, and zinc.

266.   The 2017 Level 2 Action Plan recommended several BMPs to reduce storm water exposure such as storing various materials in containers, moving the metal saw

machine beneath cover, increasing sweeping and cleaning activities, new training, better housekeeping BMPs, evaluation of hiring a street sweeper to regularly clean the Facilities surfaces, and evaluation of repaving various areas of damaged asphalt at the Facility.

267.   Despite the implementation of the BMPs recommended in the 2017 Level 2 Action Plan, the Facility again exceeded NALs for iron, aluminum, and zinc during the 2017–18 reporting period.

268.   Defendant submitted a Level 2 ERA Technical Report on December 28, 2018 for iron, aluminum, and zinc ("2018 Level 2 Technical Report").

269.   The 2018 Level 2 Technical Report acknowledges the Facility continued to fail to achieve NALs. In spite of this, the 2018 Level 2 Technical Report provided no additional BMPs to further improve the Facility's storm water management.

270.   The 2018 Level 2 Technical Report noted that the Facility will continue to "monitor and analyze stormwater discharges to ensure BMPs" are implemented properly and effectively, and that "[a]dditional BMPs will continue to be evaluated."

271.   The Facility has continued to discharge iron, aluminum, and zinc at concentrations exceeding NALs, as well as IGP Effluent Limitations and Receiving Water Limitations.

272.   As such, the 2018 Level 2 Technical Report fails to identify all BMPs that would eliminate all future NALs exceedances in violation of IGP's Level 2 Technical Report requirements. *See* 2015 & 2020 Permits § XII.D.2.a.

273.   Defendant failed to fully implement the BMPs identified in the 2018 Level 2 Technical Report.

274.   The Regional Board noted that during its inspection on January 25, 2019, "many of the identified BMPs in the Level 2 ERA Technical Report are not being fully implemented." 2019 SEL. The Facility's "failure to implement all elements of the Level 2 ERA as soon as practicable and no later than 1 year after submittal of the Level 2 ERA Action Plan is a violation of Section XII.D.1" of the IGP. *Id*.

275.   During the 2017–18 reporting period, the Facility's discharges also exceeded

the NAL for pH and N+N, and thus on July 1, 2018, the Facility entered Level 1 for pH and Level 2 for N+N.

276.   Defendant submitted a Level 1 ERA report for pH on August 9, 2019, missing the statutory deadline of January 1, 2019 by several months in violation of the IGP.

277.   The only additional BMP recommended in the Level 1 report for pH is the installation of a gravel bag berm in front of the sand and gravel and mulch storage areas.

278.   Pursuant to other ERA reports and technical plans, this gravel bag berm was already in place pursuant to the 2017 Level 1 ERA Report. Thus, this Level 1 report for pH failed to identify any new BMPs, thus failing to identify and implement BMPs "necessary to prevent future NAL exceedances and to comply with the requirements of the General Permit." *See* 2015 & 2020 § XII.C.1.c.

279.   The Facility continued to discharge storm water with very high levels of pH, and entered Level 2 status for pH as of July 1, 2020. *See* Ex. 1.

280.   The Facility was required to submit a Level 2 Action Plan for pH on or before January 1, 2021.

281.   To date, Defendant has failed to submit a Level 2 Action Plan for pH in violation of the IGP's Level 2 ERA requirements.

282.   Defendant submitted a Level 2 Technical Plan for N+N on August 27, 2019, several months past the statutory deadline of January 1, 2019, in violation of the IGP.

283.   The only BMPs identified and purportedly implemented in August 2019 pursuant to this Level 2 Technical Plan, were the exact same BMPs identified and implemented in the 2018 Level 2 Technical Report for iron aluminum, and zinc – consisting of increased employee trainings, increased sweeping, evaluation of hiring a street sweeper, and evaluation of repaving damaged asphalt – all of which were implemented over a year and a half prior.

284.   Hence, the August 2019 Level 2 Technical Plan for N+N failed to identify and implement BMPs that would comply with the Effluent Limitations of the IGP, and

fails to eliminate all future NALs, in violation of IGP's Level 2 Technical Report requirements. *See* 2015 & 2020 Permits § XII.D.2.a.

285.    As a result of these failures, the Facility has continued to discharge N+N in concentrations exceeding NALs, Effluent Limitations, and Receiving Water Limitations in violation of the IGP.

## V.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the IGP's Discharge Prohibitions and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

286.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

287.    Prohibited non-storm water discharges have and continue to discharge from the Facility. Defendant's ongoing failure to prevent unauthorized non-storm water discharges is a violation of the IGP and the CWA. 2015 & 2020 Permit § III.B; 33 U.S.C. § 1311(a).

288.    Defendant violated and will continue to violate the IGP Discharge Prohibition each and every time unauthorized non-storm water discharges from the Facility.

289.    Defendant has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Section III.C of the 2015 and 2020 Permits.

290.    Defendant has discharged and continues to discharge numerous pollutants in excess of water quality objectives listed in the Basin Plan in violation of Section III.D of the 2015 and 2020 Permits.

291.    Plaintiffs are informed and believe, and thereon allege that Defendant has been in violation of the IGP Discharge Prohibitions at the Facility every day from May 21, 2016 to the present. Plaintiffs are informed and believe, and thereon allege that

Defendant's violations of the IGP Discharge Prohibitions are ongoing and continuous.

292.   Each and every violation of the IGP Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 21, 2016 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

## SECOND CAUSE OF ACTION

### Discharges of Contaminated Storm Water in Violation of the IGP's Effluent Limitations and the Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

293.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

294.   Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities from discharging through implementation of BMPs that achieve BAT/BCT at the Facility.

295.   Discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur every time storm water discharges from the Facility.

296.   Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the IGP and the CWA. *See* 2015 Permit § I.D.32, V.A; 2020 Permit § V.A; *see also* 33 U.S.C. § 1311(b).

297.   Defendant violated and continues to violate the IGP Effluent Limitation each time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharge from the Facility.

298.   Plaintiffs are informed and believe, and thereon allege, that Defendant has been in violation of the IGP Effluent Limitation at the Facility every day from May 21,

2016, to the present. Plaintiffs are informed, believe, and thereon allege Defendant's violations of the IGP Effluent Limitation and the CWA are ongoing and continuous. Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop and/or implement BMPs to achieve BAT/BCT at the Facility.

299.   Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

300.   Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since May 21, 2016. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

### THIRD CAUSE OF ACTION
**Discharges of Contaminated Storm Water in Violation of IGP Receiving Water Limitations and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

301.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

302.   Plaintiffs are informed and believe, and thereon allege, that the Facility discharges storm water containing levels of pollutants that adversely impact human health and/or the environment.

303.   Defendant discharges storm water containing levels of pollutants that cause or contribute to exceedances of WQSs from the Facility.

304.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

305.   Plaintiffs are informed and believe, and thereon allege, that discharges of

storm water containing levels of pollutants that cause or contribute to exceedances of WQSs occur each time storm water discharges from the Facility.

306.   Defendant's discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, are violations of the IGP and the Clean Water Act. 2015 & 2020 Permit §§ VI.A–B; 33 U.S.C. § 1311(b).

307.   Plaintiffs are informed, believe, and thereon allege Defendant violated and will continue to violate the IGP Receiving Water Limitations every time storm water containing levels of pollutants that adversely impact human health or the environment, or that cause or contribute to exceedances of WQSs discharge from the Facility.

308.   Plaintiffs are informed, believe, and thereon allege Defendant's violations of the IGP Receiving Water Limitations and the CWA are ongoing and continuous.

309.   Defendant will continue to be in violation of the IGP and the CWA each time storm water containing levels of pollutants that adversely impact human health or the environment, or that causes or contributes to exceedances of WQSs is discharged from the Facility.

310.   Each day that Defendant has discharged and/or continues to discharge polluted storm water from the Facility in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

311.   Plaintiffs are informed, believe, and thereon allege Defendant has been in violation of the IGP Receiving Water Limitations every day since May 21, 2016. By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA since May 21, 2016. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

/././

/././

/././

/././

## FOURTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and/or Revise the Facility's Storm Water Pollution Prevention Plans in Violation of the IGP and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

312.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

313.    Defendant has failed and continues to fail to develop and/or implement adequate SWPPPs for the Facility.

314.    Defendant has failed and continues to fail to adequately revise the SWPPP for the Facility.

315.    Defendant conducts operations at the Facility each day without an adequately developed, implemented, and/or revised SWPPP. Defendant's failure to adequately develop, implement, and/or revise SWPPPs for the Facility is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permit § X; *see also* 33 U.S.C. § 1311(b).

316.    Defendant has been in violation of the IGP SWPPP requirements at the Facility every day from May 21, 2016 to the present. Defendant's violations of the IGP SWPPP requirements and the CWA at the Facility are ongoing and continuous.

317.    Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop, implement, and revise the Facility SWPPP.

318.    Each day Defendant operates the Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since May 21, 2016. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

/./.

/./.

/./.

# FIFTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and Revise Adequate Monitoring Implementation Plan in Violation of the IGP and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

319.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

320.   Defendant has failed and continues to fail to develop and/or implement an adequate MIP for the Facility. Defendant operates the Facility each day without an adequately developed, implemented, and/or revised MIP.

321.   Defendant's failure to adequately develop, implement, and/or revise the MIP for the Facility is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permit § XI; *see also* 33 U.S.C. § 1311(b).

322.   Defendant has been in violation of the IGP MIP requirements every day from May 21, 2016, to the present. Defendant's violations of the IGP MIP requirements and the CWA at the Facility are ongoing and continuous.

323.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to adequately develop, implement, and/or revise the Facility MIP.

324.   Each day that Defendant operates the Facility without developing, implementing, and/or revising an adequate MIP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since May 21, 2016. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

# SIXTH CAUSE OF ACTION

**Failure to Report as Required in Violation of the IGP and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

325.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

326.   Defendant has failed and continues to fail to submit accurate and/or complete Annual Reports for the Facility.

327.   The Defendant's failure to submit complete and accurate Annual Reports is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permit § XVI; *see also* 33 U.S.C. § 1311(b).

328.   Defendant conducts operations at the Facility each day without reporting as required by the IGP. Defendant has been in violation of the IGP's reporting requirements every day since at least May 21, 2016. Defendant's violations of the reporting requirements of the IGP and the CWA are ongoing and continuous.

329.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP reporting requirements at the Facility.

330.   Each and every violation of the IGP reporting requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since May 21, 2016. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

## SEVENTH CAUSE OF ACTION

### Failure to Properly Monitor in Violation of the IGP.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

331.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

332.   Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to conduct the requisite visual observations of storm water discharges at the Facility. Defendant's failure to conduct the requisite visual observations at the Facility is a violation of the IGP and the CWA. *See* 2015 & 2020 Permit § XI.A; *see also* 33 U.S.C. § 1311(b).

333.   Defendant has failed to collect and analyze the required number of storm water samples the Facility. Defendant's failure to collect and analyze the required

number of storm water samples at the Facility is a violation of the IGP and the CWA. 1997 Permit §§ B.5.a–b, 2015 Permit & 2020 Permit §§ XI.B.1–3; 33 U.S.C. § 1311(b).

334.   Defendant has failed and continues to fail to analyze all collected samples for all required parameters in violation of the IGP and the CWA. 2015 & 2020 Permit § XI; *see also* 33 U.S.C. § 1311(b).

335.   Defendant has failed and continues to fail to analyze all collected samples from all Drainage Areas in violation of the IGP and the CWA. 2015 & 2020 Permit § XI.B.4; *see also* 33 U.S.C. § 1311(b).

336.   Defendant has failed and continues to fail to comply with the IGP's monitoring requirements at the Facility since May 21, 2016. Defendant's violations of the IGP monitoring requirements and the Clean Water Act are ongoing and continuous.

337.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP's monitoring requirements.

338.   Each and every violation of the IGP's monitoring requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since May 21, 2016. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

## EIGHTH CAUSE OF ACTION

**Failure to Comply with ERA Requirements in Violation of the IGP and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

339.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

340.   Defendant has failed and continues to fail to conduct adequate Level 1 status evaluations for multiple pollutants at the Facility in violation of the IGP.

341.   Defendant has failed and continues to fail to submit adequate Level 1 ERA Reports for multiple pollutants at the Facility in violation of the IGP. *See* 2015 & 2020

Permits § XII.C.2.

342.   Defendant has failed and continues to fail to submit adequate Level 2 ERA Action Plans for multiple pollutants at the Facility in violation of the IGP. *See id*. § XII.D.1.

343.   Defendant has failed and continues to fail to submit adequate Level 2 ERA Technical Reports for multiple pollutants at the Facility in violation of the IGP. *See id*. § XII.D.2.

344.   Defendant conducts operations at the Facility each day without having conducted an adequate Level 1 Evaluation, and/or submitting adequate Level 1 ERA Reports, Level 2 ERA Action Plans, and Level 2 ERA Technical Reports in violation of the IGP. *See* 2015 & 2020 Permit §§ XII.C–D.

345.   These violations are ongoing and continuous, and the Facility will continue to be in violation of the IGP and the CWA each and every day Defendant fails to comply with the Level 1 and Level 2 ERA requirements at the Facility.

346.   Every day Defendant conducts operations at the Facility without conducting an adequate Level 1 status evaluation, and/or without submitting adequate Level 1 ERA Report, Level 2 Action Plans, and/or Level 2 Technical Reports is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

347.   Defendant has been in daily and continuous violation of the IGP's Level 1 status ERA evaluation requirement every day since October 21, 2016.

348.   Defendant has been in daily and continuous violation of the IGP for failing to submit adequate Level 1 ERA Reports every day since January 1, 2017.

349.   Defendant has been in daily and continuous violation of the IGP for failing to comply with Level 2 ERA Action Plan requirements since at least January 1, 2018.

350.   Defendant has been in daily and continuous violation of the IGP for failing to comply with Level 2 Technical Report requirements since January 1, 2019.

351.   By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the Level 1 status

Evaluation requirements occurring from October 21, 2016, to the present, and for each and every violation of the Level 1 ERA Report requirements occurring from January 1, 2017, to the present, for each and every violation of the Level 2 Action Plan requirement occurring from January 1, 2018, and for each and every violation of the Level 2 Technical Reports requirement occurring from January 1, 2019 pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. § 1319(d), 1365, and 40 C.F.R. § 19.4.

352.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

353.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray judgment against Defendant as set forth hereafter.

## VI.   RELIEF REQUESTED

354.   Plaintiffs respectfully request that this Court grant the following relief:

a.    A court order declaring the Defendant to have violated and to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to comply with discharge prohibitions, effluent limitations which include BAT/BCT requirements, and receiving water limitations, and for failing to comply with the other substantive and procedural requirements of the IGP as set forth within this Complaint;

b.    A court order enjoining Defendant from discharging pollutants from the Facility to surface waters in violation of the Clean Water Act and IGP;

c.    A court order requiring Defendant to implement affirmative injunctive measures designed to eliminate Defendant's violations of the substantive and procedural requirements of the IGP and the Clean Water Act;

d.    A court order assessing civil monetary penalties for each violation of the

CWA at $56,460.00 per day per violation for violations that occurred after November 2, 2015, as permitted by CWA Section 309(d), 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, and 40 C.F.R. § 19.4.

       e.    A court order awarding Plaintiffs their reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

       f.    Any other relief as this Court may deem appropriate.

Dated: July 27, 2021

Respectfully submitted,

COAST LAW GROUP LLP
By: s/Livia B. Beaudin
LIVIA B. BEAUDIN
Attorney for Plaintiffs
COASTAL ENVIRONMENTAL
RIGHTS FOUNDATION
E-mail: livia@coastlawgroup.com

SAN DIEGO COASTKEEPER
By: s/Matt O'Malley
MATT O'MALLEY
Attorney for Plaintiffs
SAN DIEGO COASTKEEPER
E-mail: matt@sdcoastkeeper.org