

May 21, 2021

<u>VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED</u>

Free Builders Supply Inc.          R. Joseph Free
ATTN: Managing Agent               Agent for Service of Process
1530 Linda Vista Drive             Free Builders Supply Inc.
San Marcos, CA 92078               1530 Linda Vista Drive
                                   San Marcos, CA 92078


**Re:     Notice of Violation and Intent to File Suit Under the Clean Water Act**

To the Above-Listed Recipients:

Please accept this letter on behalf of San Diego Coastkeeper ("Coastkeeper") and Coastal Environmental Rights Foundation ("CERF") regarding violations of the Clean Water Act[1] and California's General Permit for Storm Water Discharges Associated with Industrial Activities[2] (hereinafter "Industrial General Permit"), occurring at the Free Builders Supply Incorporated facility located at 1530 Linda Vista Drive, San Marcos, CA 92078 (hereinafter "Facility" or "Free Builders Facility"). The purpose of this letter is to put Free Builders Supply Incorporated ("Free Builders") and Joe Free, as the owner(s) and/or operator(s) of the Facility, on notice of the violations of the Industrial General Permit occurring at the Facility, including, but not limited to, discharges of polluted storm water from the Facility into local surface waters. Violations of the Industrial General Permit are violations of the Clean Water Act. As explained below, Free Builders and/or Joe Free are liable for violations of the Industrial General Permit and the Clean Water Act.

Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), requires that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), a citizen must give notice of his/her intention to file suit. Notice must be given to the alleged violator, the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Executive Officer of the water pollution control agency in the State in which the violations occur, and, if the alleged violator is a corporation, the registered agent of the corporation. *See* 40 C.F.R. § 135.2(a)(1). This notice letter ("Notice Letter") is being sent to you as the responsible Owners and/or Operators of the Facility, or as the registered agent for the Owners and/or Operators. This Notice Letter is issued pursuant to 33 U.S.C. §§ 1365(a) and (b) of the Clean Water Act to inform the Facility Owners and/or Operators that Coastkeeper and CERF intend to file a federal enforcement action against

---

[1] Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*
[2] National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, Order No. 97-03-DWQ ("1997 Permit"), and Order No. 2014-0057-DWQ ("2015 Permit") as amended in 2015 and 2018.

Notice of Intent to Sue: Clean Water Act
*Free Builders Supply Incorporated*
May 21, 2021
Page 2

the Free Builders and/or Joe Free for violations of the Industrial General Permit and the Clean
Water Act sixty (60) days from the date of this Notice Letter.

## 1.   BACKGROUND

### 1.1.   San Diego Coastkeeper and Coastal Environmental Rights Foundation.

San Diego Coastkeeper is a non-profit public benefit corporation organized under the
laws of the State of California with its office at 3900 Cleveland Avenue, Suite 102, San Diego,
California 92103. Founded in 1995, San Diego Coastkeeper is dedicated to the preservation,
protection, and defense of the environment, wildlife, and natural resources of San Diego County
watersheds. To further these goals, Coastkeeper actively seeks federal and state agency
implementation of the Clean Water Act, and, where necessary, directly initiates enforcement
actions on behalf of themselves and their members.

CERF is a non-profit public benefit corporation organized under the laws of the State of
California with its main office in Encinitas, California. CERF is dedicated to the preservation,
protection, and defense of the environment, the wildlife, and the natural resources of the
California Coast. CERF's mailing address is 1140 S. Coast Highway 101, Encinitas, California
92024.

Members of Coastkeeper and CERF live, work, recreate, and/or otherwise use and enjoy
the areas in and around the waters into which the Facility discharges, including San Marcos
Creek, Lake San Marcos, Batiquitos Lagoon, and the Pacific Ocean (collectively "Receiving
Waters"). Members of Coastkeeper and CERF use the Receiving Waters to swim, boat, kayak,
surf, bird watch, view wildlife, fish, hike, bike, walk, run, general aesthetic enjoyment, and/or for
educational opportunities or developing educational tools. Additionally, members of Coastkeeper
and CERF use the Receiving Waters to engage in scientific study through pollution and habitat
monitoring and restoration activities. The discharges of pollutants from the Facility impair each
of these uses. Discharges of polluted storm water from the Facility are ongoing and continuous.
Thus, the interests of Coastkeeper's and CERF's members have been, are being, and will
continue to be adversely affected by the Facility Owners and/or Operators' failure to comply
with the Clean Water Act and the Industrial General Permit.

### 1.2.   The Owners and/or Operators of the Facility.

Information available to Coastkeeper and CERF indicates that the Free Builders Supply
Incorporated and/or Joe Free has owned and/or operated the Free Builders Facility located at
1530 Linda Vista Drive, San Marcos, CA 92078, for at least the past five years. Certain
classified facilities that discharge storm water associated with industrial activity are required to
submit a Notice of Intent ("NOI") to the State Water Resources Control Board ("State Board") to
obtain Industrial General Permit coverage.[3] Information available to Coastkeeper and CERF
indicates the Facility first obtained Industrial General Permit coverage on April 8, 2016. The

---

[3] *See* 2015 and 2020 Permits, Attachment A.

Facility submitted an NOI on April 7, 2016 ("2016 NOI"), which is publicly available via the Storm Water Multiple Application & Reporting Tracking System ("SMARTS") database. The 2016 NOI lists "Free Builders Supply Incorporated" as the Facility's operator, and Joe Free as the owner of Free Builders Supply Incorporated. Joe Free is also listed as the Legally Responsible Person on the Facility's most recent Storm Water Pollution Prevention Plan ("SWPPP"), which was uploaded to SMARTS on March 16, 2018 ("2018 SWPPP"). R. Joseph Free is listed as the Agent for Service of Process for Free Builders Supply, Inc. on the California Secretary of State's business listing website. As such, Free Builders Supply Incorporated and/or Joe Free are the Owners and/or Operators of the Facility.

The Owners and/or Operators have violated and continue to violate the procedural and substantive terms of the Industrial General Permit including, but not limited to, the illegal discharge of pollutants from the Facility into local surface waters. As explained herein, the Facility Owners and/or Operators are liable for violations of the Industrial General Permit and the Clean Water Act.

### 1.3. <u>The Facility's Industrial General Permit Coverage.</u>

According to the San Diego Regional Water Quality Control Board ("Regional Board, the City of San Marcos, and the Facility's own documents, the Free Builders Facility conducts industrial activities that are subject to the Industrial General Permit. Correspondence with the Regional Board as well as the Facility's 2016 NOI list the Facility's Standard Industrial Classification ("SIC") codes for the Facility as 3281 (Cut Stone and Stone Products), and 3449 (Miscellaneous Structural Metal Work). Both of these SIC codes require Industrial General Permit coverage. 2015 & 2020 Permits, Attachment A. The 2018 SWPPP indicates SIC code 5251 (hardware store) also applies to the Facility.

The 2015 Permit required all dischargers to register for NOI coverage by July 1, 2015. While the California Secretary of State business records indicate the Facility has been operating since 1973, the Owners and/or Operators failed to enroll the Facility under the Industrial General Permit by July 1, 2015. The City of San Marcos issued multiple notices of violations and administrative citations to the Free Builders Facility Owners and/or Operators dated April 27, 2015; August 6, 2015; October 2, 2015; December 7, 2015; and March 2, 2016 which directed the Facility to register for coverage under the Industrial General Permit, as well as notified the Facility Owners and/or Operators of numerous violations of municipal storm water codes. Further, on March 18, 2016, the Regional Board notified the Facility Owners and/or Operators that the Facility is subject to, and required to enroll under, the Industrial General Permit. The Facility Owners and/or Operators finally submitted an NOI on April 7, 2016.

The Facility's Waste Discharge Identification ("WDID") number is 9 37I026525. According to the Facility's 2016 NOI, the Facility is 3.72 acres, 3.14 of which are industrial area exposed to storm water, and 98.6 percent of the Facility is impervious.

Coastkeeper and CERF put the Facility Owners and/or Operators on notice that industrial activities are conducted throughout the Facility, and thus the entire Facility requires Industrial General Permit coverage. In addition, the Industrial General Permit's definition of "storm water associated with industrial activities," as well as the Permit's explanation of material handling activities, requires Permit coverage for all storm water from non-industrial sources that comingles with industrial storm water. Because the Facility lacks best management practices ("BMPs") or other controls to separate industrial storm water flows from portions of the Facility where non-regulated activities may occur, industrial storm water at the Facility comingles with potential non-storm water, and thus all storm water discharges from the Facility require coverage under the Industrial General Permit.

### 1.4. <u>Storm Water Pollution and the Receiving Waters</u>.

With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations around San Diego County, such as the Facility, pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year. Such discharges of pollutants from industrial facilities contribute to the impairment of downstream waters and aquatic dependent wildlife. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

Polluted discharges from Facility routinely contain excessive concentrations of metals such as aluminum, iron, nitrogen, and zinc; nutrients such as nitrogen and phosphorus; total suspended solids; and pH affecting substances. According to the 2018 SWPPP, polluted storm water from the Facility flows southeast across the site, and discharges to the southeastern corner of the site towards Linda Vista Drive at Outfall 1. Polluted storm water in the northern end of the site, which the Facility SWPPP notes is leased out, discharges to the northeastern corner of the site towards South Pacific Street at Outfall 2. 2018 SWPPP § 1.4. Storm water discharges from both Outfall 1 and Outfall 2 enter the City of San Marcos municipal separate storm sewer system ("MS4"), and thereafter flow to San Marcos Creek, Lake San Marcos, Batiquitos Lagoon, and ultimately the Pacific Ocean. Discharges of polluted storm water pose threats to public health and adversely affect the aquatic environment and surrounding ecosystems.

Polluted discharges from the Facility harm the ecological significance of Receiving Waters, adversely impacting the public's ability, as well as that of Coastkeeper's and CERF's members, to use and enjoy these unique waterbodies. The Receiving Waters into which the Facility discharges polluted storm water are ecologically sensitive areas. San Marcos Creek supports delicate riparian, marsh, and wetland habitats which include a variety of flora and fauna. The portion of San Marcos Creek into which the Facility's polluted discharges flow includes rare plant species considered sensitive by various local, state, and federal agencies such as the southern tarplant, southwestern spiny rush, and the Southern California black walnut.[4] The

---

[4] San Marcos Creek Specific Plan, § 4.2,
https://www.dropbox.com/s/5jyj5jmsy9tjki5/San%20Marcos%20Creek%20Specific%20Plan.pdf?dl=0

contiguous riparian vegetation along San Marcos Creek serves as an important wildlife corridor connecting upstream and downstream viable habitat areas, as it is one of the few undeveloped, natural stretches in the otherwise heavily developed area of central San Marcos.[5] The creek is the lifeblood for numerous plant communities which provide critical refuge, food, and nesting opportunities for a variety of bird and other animal species, including endangered or sensitive species such as the southwestern willow flycatcher, least bell's vireo, California gnatcatcher, white-tailed kite, southwestern pond turtle, and arroyo toad.[6] Batiquitos Lagoon, a large ecological reserve only a few miles downstream from the Facility, also supports a rich ecosystem that is home to hundreds of fish, bird, and other animal species.[7] Storm water and non-storm water flows contaminated with metals, sediment, nutrients, and other pollutants discharged from the Facility are deleterious to invertebrates, insects, larval fish, and local vegetation in the Receiving Waters. As such, these pollutants degrade the special biological significance of the area and strain the ecosystems on which numerous species, some of which are categorized as endangered or sensitive, depend for survival.

Polluted discharges from the Facility also harm the special aesthetic and recreational significance of the Receiving Waters, adversely impacting the public's ability, as well as that of Coastkeeper's and CERF's members, to use and enjoy these unique waterbodies. The section of San Marcos Creek immediately upstream from Lake San Marcos flows adjacent to a golf course, and various ball fields, tennis courts, and the track and sports stadium of San Marcos High School. Various students and faculty from the nearby High Tech High School have collected water samples from San Marcos Creek for study. Lake San Marcos is heavily used for recreation, including boating, walking, birdwatching, and general aesthetic enjoyment. Trails and observation points along Batiquitos Lagoon are frequently used for jogging, hiking, birdwatching, photography, general aesthetic enjoyment, scientific study, and data collection, among other things. Surfing is also popular at the mouth of Batiquitos Lagoon at Ponto Beach.

Pollutants discharged from the Facility can affect the health of the Receiving Waters, and thus the plant and animal life of the surrounding habitats. For example, nutrient pollution in Lake San Marcos has caused algal blooms, fish kills, and pungent smells.[8] Damage to these natural habitats, and thus the flora and fauna within them, harms the ability of the public, including Coastkeeper's and CERF's members' ability, to use and enjoy these unique recreational and scientific opportunities. Such pollution can also negatively impact human health. Furthermore, Coastkeeper's and CERF's members are less likely to recreate in and around such waters that are known to be polluted with harmful metals, excessive nutrients, and other pollutants.

The *Water Quality Control Plan for the San Diego Basin* ("San Diego Basin Plan" or "Basin Plan") identifies the "Beneficial Uses" of water bodies in the region. The Beneficial Uses

---

[5] *Id*.

[6] *Id*.

[7] Batiquitos Lagoon Foundation, *About Batiquitos Lagoon*, http://www.batiquitosfoundation.org/about/ (last visited Mar. 4, 2021).

[8] KPBS, *Monitoring The Muddy Waters Of Lake San Marcos* (Dec. 4, 2014), https://www.kpbs.org/news/2014/dec/04/monitoring-muddy-waters-lake-san-marcos/.

for San Marcos Creek include contact water recreation; non-contact recreation; warm freshwater habitat; wildlife habitat; and agricultural supply. Basin Plan, Table 2-2. The Beneficial Uses for Batiquitos Lagoon include contact water recreation; non-contact recreation; preservation of biological habitats of special significance; estuarine habitat; wildlife habitat; rare, threatened, or endangered species; marine habitat; migration of aquatic organisms; and spawning, reproduction, and/or early development. *Id*., Table 2-3. The Beneficial Uses for the Pacific Ocean include industrial service supply; navigation; contact water recreation; non-contact water recreation, commercial and sport fishing; wildlife habitat; preservation of biological habitats of special significance; marine habitat; migration of aquatic organism; spawning, reproduction, and/or early development; shell harvesting; aquaculture; and rare, threatened, or endangered species. *Id*.

According to the 2016 303(d) List of Impaired Water Bodies, San Marcos Creek is impaired for benthic community effects, DDE, indicator bacteria, phosphorus, selenium, and toxicity; Lake San Marcos is impaired for ammonia as nitrogen, copper, nutrients, and phosphorus; and Batiquitos Lagoon is impaired for toxicity.[9] Polluted discharges from industrial sites such as the Facility contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife.

## 2.   THE FACILITY AND RELATED DISCHARGES OF POLLUTANTS

### 2.1.   The Facility Site Description and Industrial Activities.

According to the 2018 Facility SWPPP, the Free Builders Facility stores and sells concrete materials, building supplies, and mulch, as well as fabricates, stores, and sells rebar and other metal products. 2018 SWPPP § 1.2. The site is approximately 3.72 acres, 3.14 of which are exposed to precipitation. *Id*. § 1.3. The Facility is bordered to the west, north, and east by various industrial and commercial operations, and to the south by Linda Vista Drive.

Industrial activities conducted at the Facility include fabricating, welding, sawing, shearing, chiseling, hammering, machining, and grinding metals; storage, loading, and unloading of sand, dirt, mulch, gravel, concrete, rebar, wire mesh, other metal products, and other building materials; maintenance and repair of onsite equipment and transportation vehicles; tire changing and tire storage; and the sale of various building materials. *See generally*, 2018 SWPPP. Rebar is the primary structural metal fabricated, stored, sold, and otherwise used at the Facility. *Id*. § 2.2.

Certain areas of the Facility are designated for specific industrial activities including the concrete products storage area, metal fabrication area, building material storage area, mulch storage area, sand and gravel storage area, truck storage area, tire changing area, vehicle and equipment maintenance area, and the wire mesh storage area. *Id*. § 2.2.

According to the Facility SWPPP, industrial materials used and stored at the Facility include muriatic acid, acetylene, carbon dioxide, compressed gas, oxygen, top cast retarder,

---

[9] 2016 Integrated Report – All Assessed Waters, *available at* https://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2014_2016.shtml.

waste oil, Deck-o-seal base, lithochrome chemstain, Pro-tect water repellent and retarder, hydraulic fluid, silica sand, dirt, gravel, mulch, rebar, wire mesh, other metals, concrete products, tires. Information available to Coastkeeper and CERF, including a Staff Enforcement Letter ("SEL") from the Regional Board to the Facility dated February 8, 2019, indicates that engine parts, vehicle batteries, industrial waste, rusting metal, and metal tailings and shavings are also present at the Facility.

The Facility SWPPP notes that the northern portion of the site, defined as Drainage Area 2, "is leased out to tenants for miscellaneous storage of materials and equipment." Aside from this basic information, the 2018 SWPPP fails to describe the activities and materials in Drainage Area 2, or to assess the potential pollutant contribution from this area. According to the Facility's Level 2 ERA Technical Report for nitrite plus nitrate as nitrogen ("N+N") dated August 2019 ("2019 Level 2 Technical Report"), the Facility stopped monitoring Drainage Area 2 in December 2017 "due to the area being leased to other tenants for miscellaneous storage of equipment."

Information available to Coastkeeper and CERF, including numerous notices of violations and administrative citations from the City of San Marcos and a notification from the Regional Board, Drainage Area 2 requires coverage under the Industrial General Permit. Multiple notices of violations and administrative citations from the City of San Marcos indicate that cabinetry manufacturing, stone cutting, and granite countertop manufacturing occur in Drainage Area 2. Inspections dated March 6, 2015 and April 23, 2015 found "granite powder and shavings all over the parking lot area," as well as "trash and debris" in Drainage Area 2. Moreover, the City of San Marcos directed the Facility Owners and/or Operators to enroll under the Industrial General Permit as such coverage is required for operations such as "mill and wood working (i.e. kitchen cabinets), cut stone and stone products (i.e. granite counters)," as well as metal processing and fabrication, and general warehousing & storage of such materials.

Similarly, the Regional Board contacted Free Builders on March 18, 2016 stating plainly, "[y]our facility conducts industrial activities that are subject to the Statewide Industrial Storm Water General Permit Order 2014-0057-DWQ (IGP)," and that "SIC Codes 3281- Cut Stone, and, SIC Code 3449- Miscellaneous Structural Metal Work" apply to the Facility. Direction to obtain permit coverage from both the City of San Marcos and the Regional Board applied to Drainage Area 2 of the Facility. As the owner of the property, Free Builders Supply Incorporated and/or Mr. Joe Free is/are responsible for ensuring that Drainage Area 2 complies with the terms of the Industrial General Permit. As further discussed in Section 3.4 and 3.5 *supra*, the Facility Owners and/or Operators' failure to describe the industrial activities and materials, assess potential pollutant sources and BMPs implemented to address those pollutants, and collect any samples from Drainage Area 2 are violations of the Industrial General Permit and Clean Water Act.

## 2.2. Pollutants and Pollutant Sources Related to the Facility's Industrial Activities.

The Facility's industrial activities and material contribute a variety of pollutants to its storm water and non-storm water discharges. As the Facility SWPPP acknowledges, the

Facility's SIC code 3449, corresponding to miscellaneous structural metal work, requires that in addition to the total suspended solid ("TSS"), oil and grease ("O&G"), and pH, the Facility must sample for N+N, zinc, iron, and aluminum as these pollutants are commonly present at facilities engaged in various metal fabrication activities. Indeed, the Facility's own storm water monitoring data establishes that the Facility frequently discharges high concentrations of aluminum, iron, zinc, N+N, TSS, and pH, in excess of applicable water quality standards and EPA benchmarks promulgated to protect human health and the environment. Ex. 1, Facility's storm water sampling data.

According to the Facility SWPPP, certain areas of industrial activity at the Facility are associated with specific storm water pollution threats. For example, the concrete products storage area can contribute pH affecting substances; the metal fabrication area can contribute aluminum, iron, zinc, N+N, and TSS; the building materials area can contribute pH affecting substances and TSS; the mulch storage area can contribute N+N and TSS; the maintenance area can contribute O&G, aluminum, iron, zinc, and TSS; the sand and gravel storage area can contribute N+N and TSS; the truck storage area can contribute O&G, aluminum, iron, zinc, and TSS; the tire changing area can contribute O&G, aluminum, iron, zinc, and TSS; and the wire mesh storage area can contribute aluminum, iron, and zinc. 2018 SWPPP, Tables 2-2 & 3-4. The SWPPP also acknowledges that "metal fabrication processes are known to create airborne contaminants and particulates including grinding dust, welding smoke, and machining oil mist," and "[s]tock piles of raw material including sand, gravel, dirt, [and] mulch, can generate dust during the loading and unloading of the material." *Id*. § 2.2. This dust can then settle on impervious surfaces throughout the Facility, and be mobilized by storm water.

The Facility's Level 1 Exceedance Response Action Report, dated March 14, 2017 (hereinafter "2017 Level 1 Report"), also identifies the following potential pollutant sources at the Facility: TSS and N+N from loading and unloading various industrial materials in the sand and gravel storage area; TSS, aluminum, zinc, and iron from cutting and grinding activities in the metal fabrication area; aluminum, zinc, and iron from the maintenance and wire mesh storage areas; zinc from the tire changing area; and TSS, N+N, aluminum, zinc, and iron from the miscellaneous tenant storage area in Drainage Area 2, all of which the 2017 Level 1 Report acknowledge as industrial sources. 2017 Level 1 Report § 5.0. The 2017 Level 1 Report further observed "a significant amount of sediment" accumulating at Outfall 1; "[l]arge amounts of metal debris and fragments" throughout the Metal Fabrication Area; sand and gravel dispersed on the ground outside of the designated storage areas; "what appeared to be oil and hydraulic fluid staining" at the maintenance and metal fabrication areas"; and various raw metal materials stored outside on racks exposed to storm water. *Id*. §§ 6.0, 7.0.

The Regional Board's SEL dated February 8, 2019, stemming from an inspection of the Facility on January 25, 2019, identifies "[m]ultiple areas of exposed industrial activity, materials, and waste" which could contribute to pollutants in the Facility's storm water discharges. "Materials and wastes of concern include engine parts, vehicle batteries, and outdoor storage of industrial materials," "overflowing uncovered waste container (dumpster)," and "[t]rack-out of materials by vehicles." The 2019 SEL also found that many BMPs described in the Facility's various storm water management documents were not in fact fully implemented.

Multiple notices of violations and administrative citations issued by the City of San Marcos further identify numerous "areas of concern" regarding storm water regulatory compliance deficiencies, particularly in Drainage Area 2. Photos and notes from City of San Marcos Stormwater Program inspections conducted on March 6, 2015; April 23, 2015; August 4, 2015; September 30, 2015; December 7, 2015; and March 2, 2016 evidence "granite powder and shavings all over the parking lot area," "trash and debris," piles of sediment, storage of scrap metal and rusting metal, inadequate storage and containment of hazardous substances, and improper handling of solid waste and other materials. The notices of violations and administrative citations from the City of San Marcos all stated the Facility failed to comply with various municipal codes as well as provisions of the Industrial General Permit.

As noted in Sections 3.4 and 3.5, *infra*, the Facility SWPPP has failed and continues to fail to include an adequate description of potential pollutant sources, an adequate pollutant source assessment, and the Owners and/or Operators have failed and continue to fail to monitor for all pollutants as required by the Permit, particularly regarding Drainage Area 2.

Information available to Coastkeeper and CERF indicates that many of the aforementioned industrial activities occur, and industrial materials are handled, at various locations throughout the Facility either outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and/or without adequate secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility. Further, many pollutants associated with industrial activities occurring indoors or under partial shelter regularly escape via wind dispersion, track out, or otherwise, resulting in pollutant dispersal throughout the Facility. Information available to Coastkeeper and CERF indicates the pollutants associated with the Facility's industrial activities have been and continue to be tracked by vehicles, foot traffic, and dispersed via wind and storm water throughout the entire site, and on and off the Facility through ingress and egress. This results in employees, customer, and vehicles tracking metal particles, nutrients, sediment, O&G, and other pollutants off-site. The resulting illegal discharges of polluted storm water and non-storm water impact Coastkeeper's and CERF's members' use and enjoyment of the Receiving Waters by degrading the quality of those waters, and by posing risks to human wellbeing, aquatic life, and ecosystem health.

### 2.3. Facility Storm Water Flow and Discharge Locations

According to the Facility SWPPP, Drainage Area 1 encompasses 87 percent of the Facility's footprint. All of the industrial activities, materials, and areas of specific industrial activities addressed in the SWPPP, including metal fabrication area, concrete and building materials storage, maintenance area, main office, sales office, and a customer parking area, are all located within Drainage Area 1. According to the Facility SWPPP, the paved customer parking area at the southern end of the Facility has no exposure to industrial activities or materials. The majority of storm water flows from Drainage Area 1 sheetflow southeast across the site, through a gravel check damn, ultimately discharging at the southeast corner of the

Facility toward Linda Vista Drive at Outfall 1. These storm water flows then enter the City of San Marcos MS4, which discharges to San Marcos Creek.

According to the 2018 SWPPP, Drainage Area 2 is "leased out to tenants for miscellaneous storage of materials and equipment," and "no industrial operations are conducted in this area." 2018 SWPPP § 1.4. Storm water flows from Drainage Area 2 discharge to the east toward S. Pacific Street, and discharge at Outfall 2. These storm water flows also enter the City of San Marcos MS4, which thereafter discharges to San Marcos Creek.

Information available to Coastkeeper and CERF indicates that Drainage Area 2, and portions of the customer parking area in Drainage Area 1, are exposed to industrial activities and materials. As discussed in Section 2.2, *supra*, numerous inspection photos, notices of violations, and administrative citations from the City of San Marcos demonstrate that industrial activities take place in Drainage Area 2. These documents indicate that storage of numerous industrial materials, cabinetry operations, and granite countertop activities are conducted in Drainage Area 2. The City of San Marcos specifically stated that this area, and these activities, require coverage under the Industrial General Permit. Additionally, on March 18, 2016, the Regional Board informed the Facility that it conducts industrial activities that are subject to the Industrial General Permit, including the activities and operations conducted in Drainage Area 2. As such, Drainage Area 2 is exposed to industrial activities and materials, and requires coverage under the Industrial General Permit.

Information available to Coastkeeper and CERF indicates the eastern and western portions of the customer parking area serve as ingress and egress driveways through which industrial materials are regularly delivered and sold. Areas of industrial activity include "immediate access roads and rail lines used or traveled by carriers of raw materials, manufactured products, waste material, or by-products used or created by the facility." 40 C.F.R. § 122(b)(14); *see also* 2015 & 2020 Permits, Attachment C, Glossary. As driveways through the southern part of the Facility are the only ingress and egress points to all of the industrial materials used and stored in Drainage Area 1, they are both immediate access roads through which numerous industrial materials regularly traverse, and are thus subject to the Industrial General Permit.

## 3. VIOLATIONS OF THE CLEAN WATER ACT AND THE INDUSTRIAL GENERAL PERMIT

In California, any person who discharges storm water associated with certain industrial activity must comply with the terms of the Industrial General Permit in order to lawfully discharge pollutants. *See* 33 U.S.C. §§ 1311(a), 1342; 40 C.F.R. § 122.26(c)(1).

Between 1997 and June 30, 2015, the Industrial General Permit in effect was Order No. 97-03-DWQ, which Coastkeeper and CERF refer to as the "1997 Permit." On July 1, 2015, pursuant to Order No. 2014-0057-DWQ the Industrial General Permit was reissued, which Coastkeeper and CERF refer to as the "2015 Permit." On July 1, 2020, pursuant to Order 2014-0057-DWQ as amended in 2015 and 2018 ("2020 Permit"), the reissued 2020 Industrial General

Permit took effect. As explained below, the 2020 Permit includes terms that are as stringent or more stringent than the 2015 Permit. Accordingly, the Facility Owners and/or Operators are liable for violations of the 2015 Permit and ongoing violations of the 2020 Permit, and civil penalties and injunctive relief are available remedies. *See Illinois v. Outboard Marine, Inc.*, 680 F.2d 473, 480–81 (7th Cir. 1982) (relief granted for violations of an expired permit); *Sierra Club v. Aluminum Co. of Am.*, 585 F. Supp. 842, 853–54 (N.D.N.Y. 1984) (holding that the Clean Water Act's legislative intent and public policy favor allowing penalties for violations of an expired permit); *Pub. Interest Research Group of N.J. v. Carter-Wallace, Inc.*, 684 F. Supp. 115, 121–22 (D.N.J. 1988) ("[l]imitations of an expired permit, when those limitations have been transferred unchanged to the newly issued permit, may be viewed as currently in effect").

### 3.1. Discharges of Polluted Storm Water from the Facility in Violation of Industrial General Permit Discharge Prohibitions.

The Industrial General Permit contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this General Permit or another NPDES permit." 2015 & 2020 Permits § III.A. The Discharge Prohibitions provisions prohibit the direct or indirect discharge of liquids or materials other than storm water non-storm water discharges ("NSWDs"), which are not otherwise authorized by a NPDES permit, to the waters of the United States. 2015 & 2020 Permits § III.B. "Measures to control sources of unauthorized NSWDs such as spills, leakage, and dumping, must be addressed through the implementation of Best Management Practices (BMPs)." 2015 & 2020 Permit § I.C.28.

These provisions further prohibit storm water discharges and authorized NSWDs which cause or threaten to cause pollution, contamination, or nuisance as defined in Section 13050 of the California Water Code. 2015 & 2020 Permits § III.C. The California Water Code defines "contamination" as "an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease." "Pollution" is defined as "an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial uses."

Information available to Coastkeeper and CERF indicates the Facility has discharged unauthorized NSWDs in violation of the Industrial General Permit. For example, during the Regional Board's January 25, 2019 inspection, an "unknown non-stormwater discharge (NSWD) was seen leaving the industrial area of the facility." Photos included with the ensuing SEL from the Regional Board support this observation, showing NSWDs coming from the concrete products storage area, as well as evidence of track out. Multiple images from Google Earth, spanning from November 2016 to August 2019, show NSWDs draining from the concrete products storage area, as well as evidence of track out and staining from persistent NSWDs, indicating that such NSWDs are a persistent problem. The Regional Board's 2019 SEL further explained that "[f]ailure to implement minimum good housekeeping BMPs to ensure that all facility areas impacted by rinse/wash waters are cleaned as soon as possible and that prevent disposal of any rinse/wash waters or industrial materials into the storm water conveyance system

are violations of Sections X.H.1.a.iv and X.H.1.a.vii of the [Industrial General Permit]." Thus, the Facility Owners and/or Operators have illegally discharged non storm water, and failed to develop and/or implement BMPs that would prevent these NSWDs from comingling and/or discharging from the Facility in violation of the Industrial General Permit. *See* 2015 & 2020 Permits § III.B.

Information available to Coastkeeper and CERF indicates the Facility has discharged, and continues to discharge, numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters. For example, the Facility's own storm water monitoring data demonstrates the Facility has discharged, and continues to discharge, concentrations of aluminum, iron, zinc, N+N, TSS, and pH in excess of various water quality objectives, benchmarks, and other standards which were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters. *See* Ex. 1. A storm water sample collected from the Facility by CERF on December 28, 2020 also shows concentrations of iron, zinc, copper, manganese, N+N, and phosphorus in excess of such water quality objectives, benchmarks, and other standards. *See* Ex. 2, CERF sampling data. Such discharges of polluted storm water violate the Industrial General Permit. *See* 2015 & 2020 Permits § III.C.

Section III.D of the 2015 and 2020 Permits states that "[d]ischarges that violate any discharge prohibitions contained in applicable Regional Water Board Water Quality Control Plans (Basin Plans), or statewide water quality control plans and policies are prohibited." The San Diego Basin Plan designates beneficial uses for water bodies in the San Diego region and establishes water quality objectives and implementation plans to protect those beneficial uses.[10] The Basin Plan further establishes certain Waste Discharge Prohibitions.[11] Waste Discharge Prohibition number 5 of the Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited. Allowances for dilution may be made at the discretion of the Regional Board."[12] "Waste" is defined as "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation," which includes discharges of pollutants in storm water.[13] Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the San Diego Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 Permits.

Information available to Coastkeeper and CERF indicates that no express allowance for dilution has been granted by the Regional Board applicable to the Facility's discharges or to the downstream Receiving Waters. As such, and consistent with Coastkeeper and CERF's review of available information, the analytical results of storm water sampling at the Facility demonstrate

---

[10] *See* https://www.waterboards.ca.gov/sandiego/water_issues/programs/basin_plan/ for updated Basin Plan.
[11] San Diego Basin Plan, Chapter 4, page 4-19.
[12] *Id*. at page 4-20 (Waste Discharge Prohibition 5).
[13] California Water Code, § 13050(d).

that the Facility Owners and/or Operators have violated and continue to violate Discharge Prohibition III.D of the 2015 and 2020 Permits by discharging pollutants in excess of water quality objectives listed in the San Diego Basin Plan, and other "statewide water quality control plans" such as the California Toxics Rule ("CTR").[14] For example, the Facility's own storm water monitoring data shows numerous instances of concentrations of iron, nitrogen, TSS, and pH far in excess of respective Basin Plan Water Quality Objectives. Ex. 1. The storm water samples collected by CERF on December 28, 2020 show the Facility discharged concentrations of iron, manganese, nitrogen, and phosphorus in excess of the Basin Plan's objectives. Ex. 2. The Facility's monitoring data and the sample collected by CERF demonstrates the Facility has frequently discharged concentrations of zinc in excess of the CTR. Ex. 1; Ex. 2. The sample collected by CERF also demonstrates the Facility discharged concentrations of copper in excess of the CTR on December 28, 2020. Thus, the Facility has discharged and continues to discharge numerous pollutants in concentrations exceeding water quality objectives in violation of Discharge Prohibition III.D.

Coastkeeper and CERF put the Facility Owners and/or Operators on notice that the Industrial General Permit Discharge Prohibitions are violated each time storm water discharges from the Facility. *See* Exhibit 3 (setting forth dates of all precipitation events during the past five years).[15] These Discharge Prohibition violations are ongoing and will continue every time the Facility Owners and/or Operators discharge polluted storm water in violation of Discharge Prohibitions III.B, III.C, or III.D of the 2015 and 2020 Permits. Each time the Facility Owners and/or Operators discharge polluted storm water in violation of Discharge Prohibitions III.B, III.C, or III.D of the 2015 and 2020 Permits is a separate and distinct violation of the Industrial General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owners and/or Operators have been in violation since May 21, 2015, and Coastkeeper and CERF will update the dates of violations when additional information and data become available. The Facility Owners and/or Operator are subject to civil penalties for all violations of the Clean Water Act occurring since May 21, 2015.

Further, Coastkeeper and CERF put the Facility Owners and/or Operators on notice that Discharge Prohibitions III.B, III.C, and III.D are independent Industrial General Permit requirements that must be complied with, and that carrying out the iterative process triggered by exceedances of the Numeric Action Levels ("NALs") listed at Table 2 of the 2015 and 2020 Permits does not amount to compliance with the Discharge Prohibition provisions.

---

[14] 40 C.F.R. § 131.38.

[15] Exhibit 3 includes the dates of all precipitation events recorded during the past five years, and the corresponding quantity of precipitation for each such event. The data in Exhibit 3 was recorded by the National Oceanic & Atmospheric Administration at the weather monitoring station geographically nearest to the Facility with complete precipitation records. Coastkeeper and CERF will include additional dates of rain events when that information becomes available.

Notice of Intent to Sue: Clean Water Act
*Free Builders Supply Incorporated*
May 21, 2021
Page 14

**3.2.** **Discharges of Polluted Storm Water from the Facility in Violation of Industrial General Permit Effluent Limitations.**

The Industrial General Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through implementation of BMPs that achieve Best Available Technology Economically Achievable ("BAT") for toxic and non-conventional pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 2015 & 2020 Permits § V.A.

The EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). EPA Benchmarks are relevant and objective standards for evaluating whether a permittee's BMPs achieve compliance with BAT/BCT standards as required by Effluent Limitation V.A of the 2015 and 2020 Permits.[16] As such, discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants.[17]

Information available to Coastkeeper and CERF indicates that BMPs that would achieve BAT/BCT have not been developed and/or implemented at the Free Builders Facility. The Facility's own storm water monitoring data indicates that the Facility's storm water discharges frequently exceed the EPA benchmarks for aluminum, iron, zinc, N+N, TSS, and pH. For example, on March 10, 2020, the Facility discharged concentrations of aluminum at 11 mg/L exceeding the benchmark of 0.75 mg/L; iron at 2.2 mg/L exceeding the benchmark of 1.0 mg/L; zinc at 0.33 mg/L exceeding the benchmark of 0.12 mg/L; TSS at 270 mg/L exceeding the benchmark of 100 mg/L; and pH at 9.24 S.U. exceeding the benchmark of 9.0 S.U. The Facility's sample from December 23, 2019 indicates the Facility discharged N+N at a concentration of 1.8 mg/L exceeding the benchmark of 0.68 mg/L.

The analytical results from the storm water samples collected by CERF on December 28, 2020 further demonstrate the Facility's discharges contained concentrations of iron, copper, zinc, N+N, and phosphorus in excess of EPA Benchmarks. These results showed concentrations of iron at 3.23 mg/L exceeding the benchmark of 1.0 mg/L, zinc at 0.274 mg/L exceeding the benchmark of 0.12 mg/L, N+N at 1.55 mg/L exceeding the benchmark of 0.68 mg/L, copper at 0.044 mg/L exceeding the benchmark of 0.014 mg/L, and phosphorus at 2.01 mg/L exceeding the benchmark of 2.0 mg/L. Ex. 2. Thus, sampling data collected by both the Facility Owners and/or Operators and CERF indicates the Facility has failed and continues to fail to develop and/or implement BMPs that comply with the BAT/BCT requirements.

---

[16] *See United States Environmental Protection Agency (EPA) National Pollutant Discharge Elimination System (NPDES) Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (MSGP) Authorization to Discharge Under the National Pollutant Discharge Elimination System*, as modified effective February 26, 2009, Fact Sheet at 106; *see also* 65 Fed. Reg. 64839 (2000).

[17] *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914 (C.D. Cal. 2009).

Coastkeeper and CERF put the Facility Owners and/or Operators on notice that the Industrial General Permit Effluent Limitations are violated each time storm water discharges from the Facility. *See* Ex. 3. These violations are ongoing and will continue every time the Facility Owners and/or Operators discharge polluted storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards. Each time the Facility Owners and/or Operators discharge polluted storm water in violation of Effluent Limitation V.A of the 2015 and 2020 Permits is a separate and distinct violation of the Industrial General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owners and/or Operators have been in violation since May 21, 2015, and Coastkeeper and CERF will update the dates of violations when additional information and data become available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since May 21, 2015.

Further, Coastkeeper and CERF put the Facility Owners and/or Operators on notice that the 2015 and 2020 Permit Effluent Limitation V.A is an independent requirement that must be complied with, and that carrying out the iterative process triggered by exceedances of the NALs listed at Table 2 of the 2015 and 2020 Permits does not amount to compliance with Effluent Limitation V.A.

### 3.3. Discharges of Polluted Storm Water from the Facility in Violation of Industrial General Permit Receiving Water Limitations.

The Receiving Water Limitations of the 2015 and 2020 Permits prohibit storm water discharges and authorized NSWDs that cause or contribute to an exceedance of an applicable Water Quality Standard ("WQS").[18] 2015 & 2020 Permits § VI.A. The CTR and Basin Plan are applicable WQSs under the Industrial General Permit.  Discharges that contain pollutants in excess of an applicable WQS violate the Industrial General Permit Receiving Water Limitations. *Id*.

Receiving Water Limitation VI.B of the 2015 and 2020 Permits prohibits storm water discharges and authorized NSWDs to surface water that adversely impact human health or the environment. Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment constitute violations of the Industrial General Permit Receiving Water Limitation. 2015 & 2020 Permits § VI.B.

---

[18] The Basin Plan designates Beneficial Uses for the Receiving Waters. Water quality standards are pollutant concentration levels determined by the state or federal agencies to be protective of designated Beneficial Uses. Discharges above water quality standards contribute to the impairment of Receiving Waters' Beneficial Uses. Applicable water quality standards include, among others, the CTR standards and water quality objectives in the Basin Plan. Industrial storm water discharges must strictly comply with water quality standards, including those criteria listed in the applicable basin plan. *See Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166–67 (9th Cir. 1999).

Notice of Intent to Sue: Clean Water Act
*Free Builders Supply Incorporated*
May 21, 2021
Page 16

Storm water monitoring data collected by both CERF and the Facility demonstrates the Facility has repeatedly discharged numerous pollutants in excess of various applicable WQS, thus violating the permit's Receiving Water Limitations. This data demonstrates the Facility has discharged iron, manganese, nitrogen, phosphorus, TSS, and pH in excess of respective Basin Plan Water Quality Objectives. *See* Ex. 1; Ex. 2. The data also demonstrates the Facility has discharged storm water with concentrations of zinc and copper in excess of their respective CTR standards. *Id.*

As explained *supra*, the Receiving Waters are impaired, and thus unable to support designated Beneficial Uses, for some of the same pollutants discharged by the Facility. San Marcos Creek and Lake San Marcos are impaired for phosphorus. Storm water samples collected from the Facility on December 28, 2020 show concentrations of phosphorus at 2.01 mg/L, far exceeding the Basin Plan Water Quality Objective of 0.1 mg/L.

Lake San Marcos is further impaired for nutrients and ammonia as nitrogen. On numerous occasions the Facility has discharged N+N, which only constitutes a subset of total nitrogen, in excess off the Basin Plan Water Quality Objective. Ex. 1; Ex. 2. Excess concentrations of nutrients such as phosphorus and nitrogen can reduce levels of dissolved oxygen and cause hypoxia or harmful algal blooms that can create toxins. Such toxins can move up the food chain.[19] High nitrogen and phosphorus loadings also result in reduced spawning grounds and nursery habitats, fish kills, and public health concerns related to impaired drinking water sources and increased exposure to toxic microbes.[20] As such, the Facility's polluted discharges cause and/or contribute to San Marcos Creek's phosphorus impairment, and Lake San Marcos's phosphorus, nutrient, and ammonia as nitrogen impairments.

Lake San Marcos is also impaired for copper. While the Facility has never analyzed its storm water samples for copper, the sample collected by CERF on December 28, 2020 indicate a copper concentration of 0.044 mg/L, exceeding the CTR standard of 0.013 mg/L. Thus, the Facility's storm water discharges cause and/or contribute to Lake San Marcos's copper impairment.

San Marcos Creek and Batiquitos Lagoon are impaired for toxicity. Copper and zinc are highly toxic pollutants in aquatic environments, and limitations on such toxic pollutants are specifically enumerated in the CTR. 40 C.F.R. § 131.38. The Facility's discharges of these toxic metals in excess of the CTR standards cause and/or contribute to the toxicity impairment of San Marcos Creek and the Batiquitos Lagoon.

---

[19] U.S. EPA, *Nutrient Pollution, The Effects: Environment*, https://www.epa.gov/nutrientpollution/effects-environment *(last updated Apr. 15, 2019)*.

[20] U.S. EPA, *Memorandum, Nutrient Pollution and Numeric Water Quality Standards* (May 5, 2007) https://www.epa.gov/sites/production/files/2014-08/documents/nutrient-memo-may252007.pdf

The Basin Plan and CTR are applicable WQSs under the Industrial General Permit. Therefore, the Facility's frequent and ongoing storm water discharges containing concentrations of multiple pollutants in excess of applicable WQSs, which cause and/or contribute to respective impairments of Receiving Waters, violate the Receiving Water Limitations of the Industrial General Permit. 2015 & 2020 Permits § VI.A.

Discharges of elevated concentrations of pollutants in the Facility's storm water also adversely impact human health. These harmful discharges from the Facility are also violations of the Industrial General Permit Receiving Water Limitations. *See* 2015 & 2020 Permits § VI.B.

Coastkeeper and CERF put the Facility Owners and/or Operators on notice that Industrial General Permit Receiving Water Limitations are violated each time polluted storm water discharges from the Facility. *See* Ex. 3. Each time discharges of storm water from the Facility cause and/or contribute to a violation of an applicable WQS, it is a separate and distinct violation of Receiving Water Limitation VI.A of the 2015 and 2020 Permits, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Each time discharges of storm water from the Facility adversely impact human health or the environment, it is a separate and distinct violation of Receiving Water Limitation VI.B of the 2015 and 2020 Permits, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the Industrial General Permit Receiving Water Limitations. The Facility Owners and/or Operators have been in violation since ate least May 21, 2015, and Coastkeeper and CERF will update the dates of violation when additional information and data becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since May 21, 2015.

Further, Coastkeeper and CERF put the Facility Owners and/or Operators on notice that Receiving Water Limitations are independent Industrial General Permit requirements that must be complied with, and that carrying out the iterative process triggered by exceedances of the NALs listed at Table 2 of the 2015 and 2020 Permits does not amount to compliance with the Receiving Water Limitations.

### 3.4. Failure to Develop, Implement, and/or Revise an Adequate Storm Water Pollution Prevention Plan.

The Industrial General Permit requires permittees to develop and implement a Storm Water Pollution Prevention Plan prior to conducting industrial activities. 2015 & 2020 Permits §§ X.A–B. The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. 2015 & 2020 Permits § X.C. A permittee has an ongoing obligation to revise the SWPPP as necessary to ensure compliance with the Industrial General Permit.

The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map

indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan ("MIP"). 2015 & 2020 Permits §§ X.A–I.

Dischargers must evaluate their SWPPP at least annually and revise it as necessary to ensure compliance with the Industrial General Permit. 2015 Permit §§ I.J.55, X.A.9, X.B.1; 2020 Permit §§ I.K.69, X.A.9, X.B.1. The 2015 and 2020 Permits require dischargers to certify and submit via SMARTS their SWPPP within 30 days whenever the SWPPP contains significant revisions. 2015 & 2020 Permits § X.B.2. Dischargers are also required to conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results; a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system; a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed; and a visual inspection of equipment needed to implement the SWPPP. 2015 & 2020 Permits §§ X.B, XV.

The Free Builders Facility Owners and/or Operators have failed and continue to fail to develop and/or implement a SWPPP that contains BMPs to adequately prevent the exposure of pollutants to storm water, the commingling of non-storm water with storm water, and the subsequent discharge of pollutants from the Facility, in violation of the Industrial General Permit. The inadequacies of the Facility's BMPs are documented by the multiple violations enumerated in the Regional Board's February 8, 2019 SEL. This SEL identified, with supporting photos, "[m]ultiple areas of exposed industrial activity, materials, and waste," including "rusted materials with evidence of pollutant mobilization during storm events," "[a]ccumulated sediment from stockpiles being tracked out of the facility by vehicles," and "engine parts, vehicle batteries, and outdoor storage of industrial materials," all of which could contribute pollutants to the Facility's storm water discharges. The SEL explained that such "[i]mproperly managed and stored materials and wastes require corrective actions," and that materials and wastes exposed to storm water without implementation of minimum BMPs is a violation of Section X.H of the Industrial General Permit.

Specifically, the SEL identified an uncovered industrial dumpster in violation of Section X.H.1.d.iii; failure to implement BMPs to prevent trackout in violation of Section X.H.1.a.ii; and NSWDs flowing out of the industrial area indicating the Facility failed "to implement minimum good housekeeping BMPs to ensure that all facility areas impacted by rinse/wash waters are cleaned as soon as possible and that prevent disposal of any rinse/wash waters or industrial materials into the storm water conveyance system are violations of Sections X.H.1.a.iv and

Notice of Intent to Sue: Clean Water Act
*Free Builders Supply Incorporated*
May 21, 2021
Page 19

X.H.1.a.vii" of the Industrial General Permit. *See* Feb. 8, 2019 SEL. While the Facility's various ERA action plans and technical reports identify BMPs such as exposure minimization, housekeeping practices, and other controls to reduce pollutants in storm water discharges, based on the Regional Board's January 25, 2019 inspection, many of these identified BMPs are not being implemented in violation of the Industrial General Permit. *Id*.

Coastkeeper and CERF are aware that the Facility responded to the SEL on March 15, 2019 and described some corrective actions. However, the Facility's response fails to adequately address all of the violations noted in the SEL. In fact, several of the photos cited as evidence of corrections demonstrate ongoing violations, poor housekeeping, and insufficient BMPs. Moreover, stormwater data collected by both the Facility and CERF after March 15, 2019 shows consistently high levels of pollutants in exceedance of applicable WQSs and benchmarks, indicating the Facility's BMPs continue to fail to adequately (1) minimize pollutant exposure to storm water at the Facility; (2) control and minimize polluted runoff from the Facility; (3) treat and remove pollutants in storm water prior to discharge; (4) prevent or control contaminated storm water from being discharged from the Facility; or (5) prevent or control contaminated NSWDs from being discharged from the Facility, all of which violate the Industrial General Permit.

The Facility SWPPP's pollutant source assessment fails to adequately describe all industrial activities and materials, potential pollutant sources, and areas of industrial activity in violation of the Industrial General Permit. Most notably, the SWPPP fails to acknowledge or assess the industrial activities and materials in Drainage Area 2 of the Facility. According to the Facility SWPPP, "no industrial operations are conducted" in Drainage Area 2. 2018 SWPPP § 1.4. The 2018 SWPPP simply notes that this area is "leased out to tenants for miscellaneous storage of materials and equipment."

Information available to Coastkeeper and CERF indicates that Drainage Area 2 is exposed to industrial activities and materials, and as such, the SWPPP must assess the potential pollutant sources within this area. As discussed in Section 2.2, *supra*, numerous inspection photos, notices of violations, and administrative citations from the City of San Marcos demonstrate that industrial activities take place in Drainage Area 2. These documents indicate that storage of various industrial materials, cabinetry operations, and granite countertop activities are conducted in Drainage Area 2. The City of San Marcos specifically stated that this area, and these activities, required coverage under the Industrial General Permit. Further, the City of San Marcos directed these communications and instructions to Free Builders as the Owners and/or Operator of the entire Facility. Additionally, on March 18, 2016, the Regional Board informed Free Builders that the Facility required coverage under the Industrial General Permit, including the activities and operations conducted in Drainage Area 2. Therefore, all of the Industrial General Permit's SWPPP requirements apply to Drainage Area 2. Hence, the SWPPP's failure to acknowledge any of the industrial activities or materials in Drainage Area 2, much less the SWPPP's failure to assess all sources of potential storm water pollution, is a violation of the Industrial General Permit.

The Facility SWPPP also claims the customer parking lot located at the southern end of the site has "no exposure to industrial activities or materials." 2018 SWPPP § 1.4. As discussed in Section 2.3, *supra*, the eastern and western portions of the customer parking area serve as ingress and egress driveways through which industrial materials are regularly delivered and sold, and as such are exposed to industrial activity, and require coverage under the Industrial General Permit. Thus, the Facility Owner and/or Operator's failure to assess potential industrial pollutants sources from these areas is a violation of the Industrial General Permit.

The Facility Owners and/or Operators failed to implement the Facility SWPPP by July 1, 2015, as required by the Industrial General Permit. Only after numerous notices of violations and citations from the City of San Marcos, and instruction from the Regional Board, did the Facility finally enroll for coverage under the Industrial General Permit. Free Builders finally a Facility SWPPP to the SMARTS database on April 6, 2016, over nine months after the Permit's deadline.

The Facility Owners and/or Operators have also failed to revise the Facility's SWPPP to ensure compliance with the Industrial General Permit. Any significant revisions to the SWPPP must be maintained onsite and uploaded to SMARTS within thirty days of the revision. 2015 & 2020 Permits, § X.B. Despite the significant concentrations of pollutants in the Facility's storm water discharges each year, information available to Coastkeeper and CERF indicates the Facility SWPPP has remained the same since March 16, 2018, and has not been revised to include additional BMPs to eliminate or reduce these pollutants, as required by the Permit. The Regional Board's 2019 SEL also identified this issue, noting that the current SWPPP failed to reflect updates and BMPs identified in the Facility's Level 2 ERA Technical Reports, which were published well after March 16, 2018, in violation of the Industrial General Permit. Despite the Regional Board's instructions, to date, the Facility Owners and/or Operators have failed revise the Facility SWPPP.

Accordingly, the Facility Owners and/or Operators have failed and continue to fail to adequately develop, implement, and/or revise the Facility SWPPP in violation of the Industrial General Permit. Every day the Facility operates with an inadequately developed and/or implemented SWPPP, and/or with an improperly revised SWPPP is a separate and distinct violation of the Industrial General Permit and the Clean Water Act. The Facility Owners and/or Operators have been in daily and continuous violation of the Industrial General Permit SWPPP requirements since at least May 21, 2015. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since May 21, 2015.

### 3.5. Failure to Develop, Implement, and/or Revise an Adequate Monitoring and Reporting Program.

The Industrial General Permit requires permittees to develop and implement a storm water MIP prior to conducting industrial activities. 2015 & 2020 Permits, §§ X.I, XI. The MIP objectives are to ensure BMPs have been adequately developed, implemented, and revised, and confirm compliance with the Industrial General Permit's Discharge Prohibitions, Effluent

Limitations, and Receiving Water Limitations. 2015 Permit §§ I.J.55–56, X.I, XI; 2020 Permit §§ X.I, X, I.K.69–70. The MIP thus aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43; 2020 Permit Fact Sheet § J at 138.

Sections XI.B.1–5 of the 2015 and 2020 Permits require permittees to collect storm water discharge samples from a qualifying storm event ("QSE")[21] as follows: (1) from each drainage area at all discharge locations, (2) from two (2) storm events within the first half of each Reporting Year[22] (July 1 to December 31), (3) from two (2) storm events within the second half of each Reporting Year (January 1 to June 30), and (4) within four hours of the start of a discharge, or the start of Facility operations if the qualifying storm event occurs within the previous 12-hour period. The Industrial General Permit requires dischargers conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized NSWDs. 2015 & 2020 Permits § XI.A.1.

Sections XI.B.6.a–b of the 2015 and 2020 Permits require permittees to analyze samples for TSS, O&G, and pH. Section XI.B.6.c–d of the 2015 and 2020 Permits require permittees to analyze samples for all pollutants associated with the Discharger's industrial activities. Specifically, Facility Owners and/or Operators are required to sample and analyze parameters on a Facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment. 2015 & 2020 Permits § XI.B.6.c. Section XI.B.6.e of the 2015 and 2020 Permits also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with a Clean Water Act Section 303(d) listed impairment(s), or approved Total Maximum Daily Loads.

The Facility Owners and/or Operators have conducted and continue to conduct operations at the Facility with an inadequately developed, implemented, and/or revised MIP. The Facility Owners and/or Operators have failed and continue to fail to sample and analyze storm water discharges for all parameters required by the Industrial General Permit. Information available to Coastkeeper and CERF indicates the Facility's industrial activities and materials contribute significant amounts of both copper and phosphorus to the Facility's storm water discharges. For example, the storm water sample collected by CERF on December 28, 2020 shows concentrations of copper at 0.044 mg/L exceeding the CTR standard of 0.013 mg/L, and phosphorus at 2.01 mg/L exceeding the Basin Plan Objective of 0.1 mg/L. However, the Facility has failed to analyze its own storm water discharges for these parameters. This is particularly problematic as downstream Receiving Waters are impaired for these same pollutants. As discussed in greater detail in Section 3.3, *supra*, San Marcos Creek is impaired for phosphorus and toxicity, Lake San Marcos is impaired for phosphorus, copper, and nutrients, and Batiquitos Lagoon is impaired for toxicity.

---

[21] A qualifying storm event is defined as one that produces a discharge for at least one drainage area, and is preceded by 48-hours with no discharge from any drainage areas. 2015 & 2020 Permits § XI.B.1.

[22] A Reporting Year replaced the 1997 permit term Wet Season, and is defined as July 1 through June 30. 2015 Permit, Findings, ¶ 62(b).

The Facility Owners and/or Operators have failed and continue to fail to develop and/or implement a MIP that requires the collection of storm water samples "from each drainage area at all discharge locations" at the Facility in violation of Industrial General Permit. *See* 2015 & 2020 Permits § XI.B.4. While Section XI.C.4 of the Permit allow permittees to reduce the number of locations to be sampled, there is no indication the Facility Owners and/or Operators have complied with the requirements of Section XI.C.4 to justify sampling a reduced number of discharge locations at the Facility. As such, the Facility's failure to collect samples from Drainage Area 2 violates the Industrial General Permit.

The Facility Owners and/or Operators have failed and continue to fail to collect the required number of storm water samples for each reporting period. The Industrial General Permit requires Facilities to collect four samples each reporting period. However, the Facility collected only one sample during each of the 2016–2017 and 2018–2019 reporting periods, and only two samples during the 2015–2016 and reporting periods. Coastkeeper and CERF also note that the Facility was open, operating, and discharging storm water during a QSE on Saturday, January 23, 2021, but the Facility has thus far failed to upload any sampling data to SMARTS during the current reporting period. Numerous QSEs occurred during each reporting period, as evidenced by Exhibit 3. Further, the Facility was open and operating during the December 28, 2020 QSE sampled by CERF. Nonetheless, the Facility did not take a sample during this QSE. As a result, the Facility failed to sample the requisite number of QSEs during the 2020-2021 reporting year, sampling only once (on October 28, 2020).

The Facility's SWPPP, site map, MIP, and annual reports fail to adequately explain why the Facility failed to collect four samples each reporting period. Thus, the Facility's Owners and/or Operators failure to collect the required number of storm water samples during each reporting period violates the Industrial General Permit.

Finally, the Industrial General Permit requires dischargers to conduct visual observations of storm water discharges, of authorized and unauthorized NSWDs, and of BMPs. Based on information available to Coastkeeper and CERF, including the Facility's repeated violations of Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations, and failure to collect the required number of storm water samples, the Facility Owners and/or Operators fail to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

Accordingly, the Facility Owners and/or Operators have failed and continue to fail to adequately develop, implement, and/or revise a MIP, in violation of the Industrial General Permit. Every day the Facility operates with an inadequately developed and/or implemented MIP, or with an improperly revised MIP is a separate and distinct violation of the Industrial General Permit and the Clean Water Act. The Facility Owners and/or Operators have been in daily and continuous violation of the Industrial General Permit MIP requirements since at least May 21, 2015. These violations are ongoing, and Coastkeeper and CERF will include additional

violations when information becomes available. The Facility Owners and/or Operators are
subject to civil penalties for all violations of the Clean Water Act occurring since May 21, 2015.

### 3.6. <u>Failure to Comply with the Industrial General Permit's Reporting Requirements</u>.

The Industrial General Permit requires Permittees to submit all sampling and analytical
results for all samples via SMARTS within thirty days of obtaining all results for each sampling
event. 2015 & 2020 Permits § XI.B.11.a. The Facility Owners and/or Operators failed to comply
with these reporting requirements. For example, Facility Owners and/or Operators uploaded
storm water sampling lab reports dated March 26, 2020 and April 27, 2020, on June 12, 2020,
over thirty after they were received.

The 2015 and 2020 Permits require dischargers to submit an annual report to the
applicable Regional Board by July 15 of each year. The Annual report must include a (1)
Compliance Checklist that indicates whether a discharger complies with, and has addressed all
applicable requirements of the Permit, (2) an explanation for any noncompliance of requirements
within the Reporting Year (3) an identification, including page numbers and/or Sections, of all
revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual
Evaluation. 2015 & 2020 Permits § XVI. The Industrial General Permit requires that all reports,
certifications, or other information required by the Permit or requested by a regional board are
signed by an authorized facility and certified for accuracy. 2015 & 2020 Permits § XXI.K.

In each Annual Report, the Facility Owners and/or Operators certify that: (1) a complete
Annual Comprehensive Site Compliance Evaluation was conducted as required by the Industrial
General Permit; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the
SWPPP complies with the Industrial General Permit, or will otherwise be revised to achieve
compliance. "Clean Water Act section 309(c)(4) provides that any person that knowingly makes
any false material statement, representation, or certification in any record or other document
submitted or required to be maintained under this General Permit, including reports of
compliance or noncompliance shall upon conviction, be punished by a fine of not more than
$10,000 or by imprisonment for not more than two years or by both." 2015 & 2020 Permits §
XXI.N.

The Facility Owners and/or Operators have submitted multiple annual reports which were
certified attesting to the Facility's compliance with the terms of the Industrial General Permit.
However, information available to Coastkeeper and CERF indicates that these certifications are
erroneous. As discussed throughout Section 3 of this Notice Letter, the Facility has violated, and
continues to violate, numerous provision of the Industrial General Permit. The Facility's Legally
Responsible Person knew or should have known the Facility had failed to comply with numerous
procedural and substantive provisions of the Industrial General Permit, and thus certifications of
these annual reports were erroneous.

Given that the Free Builders Facility Owners and/or Operators have failed to comply with
the Industrial General Permit's reporting requirements and falsified reports and certification, the
Facility is in daily violation of the Industrial General Permit. Every day the Facility Owners

and/or Operators conduct operations at the Facility without reporting as required by the Industrial General Permit is a separate and distinct violation of the Industrial General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owners and/or Operators have been in daily and continuous violation of the Industrial General Permit's reporting requirements every day since at least May 21, 2015. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since May 21, 2015.

### 3.7. <u>Failure to Comply with Exceedance Response Action Requirements</u>.

The 2015 and 2020 Permits incorporates a "multiple objective performance measurement system" utilizing Numeric Action Levels ("NALs") and Exceedance Response Actions ("ERAs"). 2015 Permit § I.M.61; 2020 Permit § I.N.75. The NALs/TNALs consist of annual and instantaneous numeric thresholds for various pollutants. An exceedance of a NAL/TNAL value for any given pollutant triggers an iterative process whereby the facility Owners and/or Operators must engage in specific ERAs as required by the 2015 and 2020 Permits.

When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status" for all parameters listed in Table 2 of the Permit. 2015 & 2020 Permits § XII.B. A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. *Id.* § XII.C. Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred, and the discharger enters the ERA iterative process. *Id.* The ERA process requires the discharger to conduct an evaluation, with the assistance of a Qualified Industrial Storm Water Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s) by October 1 following commencement of Level 1 status. *Id.* §§ XII.C.1.a–b. The evaluation must include the identification of the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL/TNAL exceedances and to comply with the requirements of the General Permit. *Id.* § XII.C.1.c. Although the evaluation may focus on the drainage areas where the NAL/TNAL exceedance(s) occurred, all drainage areas shall be evaluated. *Id.*

Based upon this Level 1 status evaluation, the permittee is required to prepare a Level 1 ERA Report no later than January 1 following commencement of Level 1 status. *Id.* § XII.C.2. The Level 1 Report must be prepared by a QISP and include a summary of the Level 1 ERA evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded a NAL/TNAL. *Id.* §§ XII.C.2.a.i–ii. The SWPPP revisions and additional BMP development and implementation must also be completed by January 1, and the Level 1 status discharger is required to submit via SMARTS the Level 1 ERA Report certifying the evaluation has been conducted, and SWPPP revisions and BMP implementation have been completed. *Id.* A permittee's Level 1 status for a parameter will return to Baseline status if a Level 1 ERA report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to

BMP implementation indicate no additional NAL/TNALs exceedances for that parameter. *Id.* § XII.C.2.b. A permittee will enter a Level 2 status if there is a NAL exceedance of the same parameter when the discharger is in Level 1 status. *Id.* § D.

The NALs/TNALs are not intended to serve as technology-based or water quality-based numeric effluent limitations, and are not derived directly from either BAT/BCT requirements or receiving water objectives. *Id.* § I.M.63. As such, NAL exceedances are not, in and of themselves, violations of the Industrial General Permit. *Id.* However, NAL exceedances indicate that a given facility's overall pollutant control performance is poor. *Id.* § I.M.61. Furthermore, "[a] Discharger that does not fully comply with the Level 1 status and/or Level 2 status ERA requirements, when required by the terms of this General Permit, is in violation of this General Permit." *Id.* § I.M.63.; 2020 Permit § I.N.77.

The Facility Owners and/or Operators have failed to comply with several of the Industrial General Permit's ERA requirements. The Facility's storm water monitoring data from the 2015–16 reporting period shows the Facility exceeded the annual NALs for TSS, aluminum, iron, zinc, and N+N. As such, the Facility entered Level 1 status for the aforementioned parameters on July 1, 2016. However, the Owners and/or Operators failed to complete a Level 1 ERA evaluation by October 1, 2016, as required by Section XII.C.1 of the Permit. The Facility Owners and/or Operators further failed to submit a Level 1 ERA report, complete SWPPP revisions, and implement any BMPs identified in the evaluation by the statutory deadline of January 1, 2017. *See* 2015 & 2020 Permits § XII.C.2. Further, storm water monitoring data demonstrates the Facility has continued to discharge pollutants in excess of applicable NALS, and thus the Facility's Level 1 ERA Report failed to identify and implement BMPs "necessary to prevent future NAL exceedances and to comply with the requirements of the General Permit." *See* 2015 & 2020 § XII.C.1.c.

Dischargers with Level 2 status shall certify and submit via SMARTS a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during which the NAL exceedance(s) occurred. For each new Level 2 NAL exceedance, the Level 2 Action Plan will identify a demonstration from subsections D.2.a–c the Discharger must perform. 2015 & 2020 Permits § XII.D.1.a. Each Level 2 ERA Action Plan shall include a schedule and a detailed description of the tasks required to complete the Discharger's selected demonstration(s) as described Sections D.2.a–c. *Id.* § XII.D.1.e. All elements of the Level 2 ERA Action Plan shall be implemented as soon as practicable and completed no later than one year after submitting the Level 2 ERA Action Plan. *Id.* § XII.D.1.d. A Facility in Level 2 status must also certify and submit a Level 2 ERA Technical Report by January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan. *Id.* § XII.D.2. The Facility remains in Level 2 status until "results from four (4) subsequent consecutive QSEs sampled indicate no additional NAL exceedance(s) for that parameter(s)." *Id.* § XII.D.4.a.

The Facility's storm water monitoring data from the 2016–17 reporting period shows the Facility again exceeded the annual NALs for iron, aluminum, and zinc, and as such the Facility

entered Level 2 for these parameters as of July 1, 2017. The Facility Owners and/or Operators submitted a Level 2 ERA Action Plan on December 28, 2017 ("2017 Level 2 Action Plan"). This Action plan recommended several BMPs to reduce storm water exposure such as storing various materials in containers, moving the metal saw machine beneath cover, increasing sweeping and cleaning activities, new training, better housekeeping BMPs, evaluation of hiring a street sweeper to regularly clean the Facilities surfaces, and evaluation of repaving various areas of damaged asphalt at the Facility.

Despite the implementation of these BMPs, the Facility again exceeded NALs for iron, aluminum, zinc, and N+N during the 2017–18 reporting period. The Facility Owners and/or Operators submitted a Level 2 ERA Technical Report on December 28, 2018 for iron, aluminum, and zinc ("2018 Level 2 Technical Report"). This report failed to acknowledge or address N+N in violation of the Industrial General Permit. The 2018 Level 2 Technical Report acknowledges the Facility continued to fail to achieve NALs. In spite of this, the 2018 Level 2 Technical Report provides no additional BMPs to further improve the Facility's storm water management. Instead the 2018 Level 2 Technical Report states that the Facility will continue to "monitor and analyze stormwater discharges to ensure BMPs" are implemented properly and effectively, and that "[a]dditional BMPs will continue to be evaluated." The Facility has continued to discharge iron, aluminum, and zinc at concentrations exceeding NALs, as well as Industrial General Permit Effluent Limitations and Receiving Water Limitations, as discussed in Sections 3.2 and 3.3, *supra*. As such, the 2018 Level 2 Technical Report fails to identify all BMPs that would eliminate all future NALs exceedances in violation of Industrial General Permit's Level 2 Technical Report requirements. *See* 2015 & 2020 Permits § XII.D.2.a.

Furthermore, the Facility Owners and/or Operators failed to fully implement the BMPs identified in the 2018 Level 2 Technical Report. Based on the Regional Board's inspection on January 25, 2019, "many of the identified BMPs in the Level 2 ERA Technical Report are not being fully implemented." *See* 2019 Regional Board SEL. As stated in the Regional Board's 2019 SEL, the Facility's "failure to implement all elements of the Level 2 ERA as soon as practicable and no later than 1 year after submittal of the Level 2 ERA Action Plan is a violation of Section XII.D.1" of the Industrial General Permit.

During the 2017–18 reporting period, the Facility's discharges also exceeded the NAL for pH, and thus the Facility entered Level 1 for pH on July 1, 2018. The Facility Owners and/or Operators submitted a Level 1 ERA report for pH on August 9, 2019, missing the statutory deadline of January 1, 2019 by several months in violation of the Industrial General Permit. The only additional BMP recommended in the Level 1 report for pH is the installation of a gravel bag berm in front of the sand and gravel and mulch storage areas. However, pursuant to other ERA reports and technical plans, this gravel bag berm was already in place pursuant to the 2017 Level 1 ERA Report. Thus, this Level 1 report for pH failed to identify any new BMPs, thus failing to identify and implement BMPs "necessary to prevent future NAL exceedances and to comply with the requirements of the General Permit." *See* 2015 & 2020 § XII.C.1.c. Moreover, the Facility has continued to discharge storm water with very high concentrations of pH, and entered Level 2 status for pH as of July 1, 2020. *See* Ex. 1. As such, the Facility was required to submit a Level 2 Action Plan for pH on or before January 1, 2021. To date, the Facility Owners and/or

Operators have failed to submit a Level 2 Action Plan for pH in violation of the Industrial General Permit's requirements.

The Facility Owners and/or Operators submitted a Level 2 Technical Plan for N+N on August 27, 2019, over a year and a half past the statutory deadline of January 1, 2018, in violation of the Industrial General Permit. The only BMPs identified and purportedly "implemented" in August 2019 pursuant to this Level 2 Technical Plan, were the exact same BMPs identified and implemented in the 2018 Level 2 Technical Report for iron aluminum, and zinc – consisting of increased employee trainings, increased sweeping, evaluation of hiring a street sweeper, and evaluation of repaving damaged asphalt – all of which were implemented over a year and a half prior. Hence, this August 2019 Level 2 Technical Plan for N+N failed to identify and implement BMPs that would comply with the Effluent Limitations of the Industrial General Permit, and fails to eliminate all future NALs, in violation of Industrial General Permit's Level 2 Technical Report requirements. *See* 2015 & 2020 Permits § XII.D.2.a. As a result of these failures, the Facility has continued to discharge N+N in concentrations exceeding NALs, Effluent Limitations, and Receiving Water Limitations in violations of the Industrial General Permit.

The Facility Owners and/or Operators have failed and continue to fail to conduct adequate Level 1 status evaluation and report that complies with the Industrial General Permit. Additionally, the Facility Owners and/or Operators have failed and continue to fail to comply with ERA Level 2 requirements. As such, the Facility Owners and/or Operators are in daily violation of the Industrial General Permit. Every day the Facility Owners and/or Operators conduct operations at the Facility without an adequate Level 1 status evaluation, and/or without submitting adequate Level 1 ERA Reports, Level 2 Action Plans, and Level 2 Technical Reports, is a separate and distinct violation of the Industrial General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owners and/or Operators have been in daily and continuous violation of the Industrial General Permit's Level 1 status ERA evaluation requirement every day since October 1, 2016. The Facility Owners and/or Operators have been in daily and continuous violation of the Industrial General Permit for failing to submit adequate Level 1 ERA Reports every day since January 1, 2017. The Facility Owners and/or Operators have been in daily and continuous violation of the Industrial General Permit for failing to comply with Level 2 ERA Action Plan requirements since at least January 1, 2018. The Facility Owners and/or Operators have been in daily and continuous violation of the Industrial General Permit for failing to certify and submit Level 2 Technical Reports since January 1, 2019. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act and Industrial General Permit's requirements.

## 4. RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five years prior to the date of the Notice Letter. These provisions of law

authorize civil penalties of $37,500.00 per day per violation for all Clean Water Act violations after January 12, 2009 and $55,800.00 per day per violation for violations that occurred after November 2, 2015.

In addition to civil penalties, Coastkeeper and CERF will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law. Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), Coastkeeper and CERF will seek to recover their litigation costs, including attorneys' and experts' fees.

## 5.  CONCLUSION

Coastkeeper and CERF are willing to discuss effective remedies for the violations described in this Notice Letter. However, upon expiration of the 60-day notice period, Coastkeeper and CERF intend to file a citizen suit under Section 505(a) of the Clean Water Act for the Free Builders Facility Owners and/or Operators' violations of the Industrial General Permit.

If you wish to pursue settlement discussions, please contact Coastkeeper and CERFs legal counsel:

| San Diego Coastkeeper | Coastal Environmental Rights Foundation |
|---|---|
| Matt O'Malley | Marco Gonzalez |
| Patrick McDonough | Livia Borak Beaudin |
| matt@sdcoastkeeper.org | livia@coastlawgroup.com |
| San Diego Coastkeeper | Coast Law Group, LLP |
| 3900 Cleveland Ave Suite 102 | 1140 South Coast Highway 101 |
| San Diego, California 92103 | Encinitas, California 92024 |
| Tel: 619-758-7743 | Tel: 760-942-8505 |

Sincerely,

Matt O'Malley
Patrick McDonough
Attorneys for San Diego Coastkeeper

Marco Gonzalez
Livia Borak Beaudin
Attorneys for Coastal Environmental Rights Foundation

Notice of Intent to Sue: Clean Water Act
*Free Builders Supply Incorporated*
May 21, 2021
Page 29

# SERVICE LIST

<u>VIA U.S. MAIL</u>

David Gibson
Executive Officer
San Diego Regional Water Quality Control Board
2375 Northside Drive, Suite 100
San Diego, California 92108

Michael Regan, Administrator
Environmental Protection Agency
Office of the Administrator 1101A
1200 Pennsylvania Ave N.W
Washington, DC 20460

Deborah Jordan
Acting Regional Administrator
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, California 94105

Eileen Sobeck
Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812–0110

R. Joseph Free
Free Builders Supply, Inc.
960 Quails Trail
Vista Ca 92081

**Exhibit 1**

Storm Water Sampling Results from the Free Builders Supply, Inc. Facility

| No. | Date of Sample Collection | Sample Location | Parameter | Units | Result | Basin Plan WQO/EPA Benchmark |
|---|---|---|---|---|---|---|
| 1 | 10/28/2020 | Outfall 1 | Aluminum, Total | mg/L | 4.4 | 0.75[1] |
| 2 | 10/28/2020 | Outfall 1 | Iron, Total | mg/L | 5.4 | 0.3[2] |
| 3 | 10/28/2020 | Outfall 1 | Zinc, Total | mg/L | .2 | 0.12[1, 3] |
| 4 | 10/28/2020 | Outfall 1 | pH | SU | 9.83 | 6.5-8.5[2] |
| 5 | 10/28/2020 | Outfall 1 | N+N | mg/L | 2.2 | 0.68[1] |
| 6 | 4/10/20 | S-1 | Aluminum, Total | mg/L | 2.1 | 0.75[1] |
| 7 | 4/10/20 | S-1 | Iron, Total | mg/L | 3.6 | 0.3[2] |
| 8 | 4/10/20 | S-1 | N+N | mg/L | 0.25 | 0.68[1] |
| 9 | 4/10/20 | S-1 | Oil and Grease | mg/L | ND | 15[1] |
| 10 | 4/10/20 | S-1 | TSS | mg/L | 37 | 100[1] |
| 11 | 4/10/20 | S-1 | Zinc, Total | mg/L | 0.06 | 0.12[1, 3] |
| 12 | 4/10/20 | S-1 | pH | SU | 9.26 | 6.5-8.5[2] |
| 13 | 3/10/20 | S-1 | Aluminum, Total | mg/L | 11 | 0.75[1] |
| 14 | 3/10/20 | S-1 | Iron, Total | mg/L | 17 | 0.3[2] |
| 15 | 3/10/20 | S-1 | N+N | mg/L | 0.51 | 0.68[1] |
| 16 | 3/10/20 | S-1 | Oil and Grease | mg/L | 1.5 | 15[1] |
| 17 | 3/10/20 | S-1 | TSS | mg/L | 270 | 100[1] |
| 18 | 3/10/20 | S-1 | Zinc, Total | mg/L | 0.33 | 0.12[1, 3] |
| 19 | 3/10/20 | S-1 | pH | SU | 9.24 | 6.5-8.5[2] |
| 20 | 12/23/19 | S-1 | Aluminum, Total | mg/L | 1.5 | 0.75[1] |
| 21 | 12/23/19 | S-1 | Iron, Total | mg/L | 2.2 | 0.3[2] |
| 22 | 12/23/19 | S-1 | N+N | mg/L | 1.8 | 0.68[1] |
| 23 | 12/23/19 | S-1 | Oil and Grease | mg/L | ND | 15[1] |
| 24 | 12/23/19 | S-1 | TSS | mg/L | 29 | 100[1] |
| 25 | 12/23/19 | S-1 | Zinc, Total | mg/L | 0.082 | 0.12[1, 3] |
| 26 | 12/23/19 | S-1 | pH | SU | 9.54 | 6.5-8.5[2] |
| 27 | 12/6/19 | S-1 | Aluminum, Total | mg/L | 6.6 | 0.75[1] |
| 28 | 12/6/19 | S-1 | Iron, Total | mg/L | 8.6 | 0.3[2] |
| 29 | 12/6/19 | S-1 | N+N | mg/L | 1.4 | 0.68[1] |
| 30 | 12/6/19 | S-1 | Oil and Grease | mg/L | 3 | 15[1] |
| 31 | 12/6/19 | S-1 | TSS | mg/L | 170 | 100[1] |
| 32 | 12/6/19 | S-1 | Zinc, Total | mg/L | 0.24 | 0.12[1, 3] |
| 33 | 12/6/19 | S-1 | pH | SU | 9.26 | 6.5-8.5[2] |
| 34 | 5/16/19 | S-1 | Aluminum, Total | mg/L | 3.7 | 0.75[1] |
| 35 | 5/16/19 | S-1 | Iron, Total | mg/L | 5.2 | 0.3[2] |

| No. | Date of Sample Collection | Sample Location | Parameter | Units | Result | Basin Plan WQO/EPA Benchmark |
|-----|------|-----|------|------|------|------|
| 36 | 5/16/19 | S-1 | N+N | mg/L | 1.353 | 0.68[1] |
| 37 | 5/16/19 | S-1 | Oil and Grease | mg/L | ND | 15[1] |
| 38 | 5/16/19 | S-1 | TSS | mg/L | 59 | 100[1] |
| 39 | 5/16/19 | S-1 | Zinc, Total | mg/L | 0.14 | 0.12[1, 3] |
| 40 | 5/16/19 | S-1 | pH | SU | 7 | 6.5-8.5[2] |
| 41 | 2/27/18 | S-1 | Aluminum, Total | mg/L | 3.67 | 0.75[1] |
| 42 | 2/27/18 | S-1 | Iron, Total | mg/L | 3.77 | 0.3[2] |
| 43 | 2/27/18 | S-1 | N+N | mg/L | 1.75 | 0.68[1] |
| 44 | 2/27/18 | S-1 | Oil and Grease | mg/L | 2.1 | 15[1] |
| 45 | 2/27/18 | S-1 | TSS | mg/L | 37.6 | 100[1] |
| 46 | 2/27/18 | S-1 | Zinc, Total | mg/L | 0.225 | 0.12[1, 3] |
| 47 | 2/27/18 | S-1 | pH | SU | 9.9 | 6.5-8.5[2] |
| 48 | 1/9/18 | S-1 | Aluminum, Total | mg/L | 1.42 | 0.75[1] |
| 49 | 1/9/18 | S-1 | Iron, Total | mg/L | 2.42 | 0.3[2] |
| 50 | 1/9/18 | S-1 | N+N | mg/L | 2.48 | 0.68[1] |
| 51 | 1/9/18 | S-1 | Oil and Grease | mg/L | ND | 15[1] |
| 52 | 1/9/18 | S-1 | TSS | mg/L | 34.6 | 100[1] |
| 53 | 1/9/18 | S-1 | Zinc, Total | mg/L | 0.142 | 0.12[1, 3] |
| 54 | 1/9/18 | S-1 | pH | SU | 9.3 | 6.5-8.5[2] |
| 55 | 2/27/17 | S-1 | Aluminum, Total | mg/L | 0.989 | 0.75[1] |
| 56 | 2/27/17 | S-2 | Aluminum, Total | mg/L | 3.6 | 0.75[1] |
| 57 | 2/27/17 | S-1 | Iron, Total | mg/L | 1.3 | 0.3[2] |
| 58 | 2/27/17 | S-2 | Iron, Total | mg/L | 4.76 | 0.3[2] |
| 59 | 2/27/17 | S-1 | N+N | mg/L | 1 | 0.68[1] |
| 60 | 2/27/17 | S-2 | N+N | mg/L | 0.058 | 0.68[1] |
| 61 | 2/27/17 | S-1 | Oil and Grease | mg/L | ND | 15[1] |
| 62 | 2/27/17 | S-2 | Oil and Grease | mg/L | ND | 15[1] |
| 63 | 2/27/17 | S-2 | TSS | mg/L | 140 | 100[1] |
| 64 | 2/27/17 | S-1 | TSS | mg/L | 7 | 100[1] |
| 65 | 2/27/17 | S-1 | Zinc, Total | mg/L | 0.145 | 0.12[1, 3] |
| 66 | 2/27/17 | S-2 | Zinc, Total | mg/L | 0.523 | 0.12[1, 3] |
| 67 | 2/27/17 | unknown | pH | SU | 6.5 | 6.5-8.5[2] |
| 68 | 2/27/17 | unknown | pH | SU | 7.5 | 6.5-8.5[2] |
| 69 | 5/6/16 | S-1 | Aluminum, Total | mg/L | 7.66 | 0.75[1] |
| 70 | 5/6/16 | S-1 | Iron, Total | mg/L | 12.8 | 0.3[2] |
| 71 | 5/6/16 | S-1 | N+N | mg/L | 0.25 | 0.68[1] |
| 72 | 5/6/16 | S-1 | Oil and Grease | mg/L | 1.1 | 15[1] |

| No. | Date of Sample Collection | Sample Location | Parameter | Units | Result | Basin Plan WQO/EPA Benchmark |
|-----|---------------------------|-----------------|-----------|-------|--------|------------------------------|
| 73 | 5/6/16 | S-1 | TSS | mg/L | 203 | 100[1] |
| 74 | 5/6/16 | S-1 | Zinc, Total | mg/L | 0.37 | 0.12[1, 3] |
| 75 | 5/6/16 | S-1 | pH | SU | 8.02 | 6.5-8.5[2] |
| 76 | 4/7/16 | S-1 | Aluminum, Total | mg/L | 6.11 | 0.75[1] |
| 77 | 4/7/16 | S-1 | Iron, Total | mg/L | 13.2 | 0.3[2] |
| 78 | 4/7/16 | S-1 | N+N | mg/L | 1.4 | 0.68[1] |
| 79 | 4/7/16 | S-1 | Oil and Grease | mg/L | 3.7 | 15[1] |
| 80 | 4/7/16 | S-1 | TSS | mg/L | 178 | 100[1] |
| 81 | 4/7/16 | S-1 | Zinc, Total | mg/L | 0.47 | 0.12[1, 3] |
| 82 | 4/7/16 | S-1 | pH | SU | 6.86 | 6.5-8.5[2] |

[1] EPA Benchmark
[2] Basin Plan Water Quality Objective
[3] California Toxics Rule Criteria



**EnviroMatrix** **Analytical, Inc.**

08 February 2021

Coastal Environmental Rights Foundation                **EMA Log #: 20L0905**

Attn:  Livia Beaudin

1140 South Coast Highway 101

Encinitas, CA 92024


**Project:     Stormwater/December 30, 2020**

Enclosed are the results of analyses for samples received by the laboratory on 12/30/20 12:33.  Samples were analyzed pursuant to client request utilizing EPA or other ELAP approved methodologies.  I certify that this data is in compliance both technically and for completeness.


**Leland S. Pitt**

**Laboratory Director**


CA ELAP Certification #: 2564


## PLEASE NOTE OUR NEW LOCATION:

9590 Chesapeake Dr. - San Diego, California 92123 - (858) 560-7717 - Fax (858) 560-7763

**Analytical Chemistry Laboratory**

| Client Name: | Coastal Environmental Rights Foundation | EMA Log #:  20L0905 |
|---|---|---|
| Project Name: | Stormwater | |

### ANALYTICAL REPORT FOR SAMPLES

| Sample ID | Laboratory ID | Matrix | Date Sampled | Date Received |
|---|---|---|---|---|
| Free Builders | 20L0905-01 | Stormwater | 12/28/20 09:38 | 12/30/20 12:33 |
| SM Creek | 20L0905-02 | Stormwater | 12/28/20 10:48 | 12/30/20 12:33 |
| Discovery | 20L0905-03 | Stormwater | 12/28/20 11:19 | 12/30/20 12:33 |
| Discovery | 20L0905-04 | Stormwater | 12/30/20 11:25 | 12/30/20 12:33 |

*The results in this report apply to the samples analyzed in accordance with the chain of custody document. This analytical report must be reproduced in its entirety.*

 EnviroMatrix Analytical, Inc.

| Client Name: | Coastal Environmental Rights Foundation | EMA Log #:  20L0905 |
|---|---|---|
| Project Name: | Stormwater | |

## Total Metals by EPA 200 Series Methods

| Analyte | Result | MDL | Reporting Limit | Units | Dilution | Analyst | Batch | Sample Prepared / Sample Analyzed | Method | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| **Free Builders (20L0905-01) Stormwater**  Sampled: 12/28/20 09:38  Received: 12/30/20 12:33 ||||||||||
| **Copper** | <mark>0.044</mark> | 0.0004 | 0.020 | mg/l | 2 | icpms | 1020495 | 02/04/21 14:32  02/05/21 16:49 | EPA 200.8 | |
| **Iron** | <mark>3.23</mark> | 0.003 | 0.100 | " | " | icpms | " | 02/04/21 14:32  02/05/21 16:49 | " | |
| **Manganese** | <mark>0.078</mark> | 0.0002 | 0.010 | " | " | icpms | " | 02/04/21 14:32  02/05/21 16:49 | " | |
| **Lead** | **0.005** | 0.0002 | 0.010 | " | " | icpms | " | 02/04/21 14:32  02/05/21 16:49 | " | J |
| Selenium | ND | 0.008 | 0.010 | " | " | icpms | " | 02/04/21 14:32  02/05/21 16:49 | " | |
| **Zinc** | <mark>0.274</mark> | 0.0006 | 0.040 | " | " | icpms | " | 02/04/21 14:32  02/05/21 16:49 | " | |
| **SM Creek (20L0905-02) Stormwater**  Sampled: 12/28/20 10:48  Received: 12/30/20 12:33 ||||||||||
| **Copper** | **0.023** | 0.0002 | 0.010 | mg/l | 1 | icpms | 1020495 | 02/04/21 14:32  02/05/21 16:26 | EPA 200.8 | |
| **Iron** | **0.974** | 0.002 | 0.050 | " | " | icpms | " | 02/04/21 14:32  02/05/21 16:26 | " | |
| **Manganese** | **0.049** | 0.0001 | 0.005 | " | " | icpms | " | 02/04/21 14:32  02/05/21 16:26 | " | |
| **Lead** | **0.002** | 0.0001 | 0.005 | " | " | icpms | " | 02/04/21 14:32  02/05/21 16:26 | " | J |
| Selenium | ND | 0.004 | 0.005 | " | " | icpms | " | 02/04/21 14:32  02/05/21 16:26 | " | |
| **Zinc** | **0.163** | 0.0003 | 0.020 | " | " | icpms | " | 02/04/21 14:32  02/05/21 16:26 | " | |
| **Discovery (20L0905-03) Stormwater**  Sampled: 12/28/20 11:19  Received: 12/30/20 12:33 ||||||||||
| **Copper** | **0.020** | 0.001 | 0.050 | mg/l | 5 | icpms | 1020495 | 02/04/21 14:32  02/05/21 16:51 | EPA 200.8 | J |
| **Iron** | **4.63** | 0.008 | 0.250 | " | " | icpms | " | 02/04/21 14:32  02/05/21 16:51 | " | |
| **Manganese** | **0.176** | 0.0005 | 0.025 | " | " | icpms | " | 02/04/21 14:32  02/05/21 16:51 | " | |
| **Lead** | **0.003** | 0.0005 | 0.025 | " | " | icpms | " | 02/04/21 14:32  02/05/21 16:51 | " | J |
| Selenium | ND | 0.019 | 0.025 | " | " | icpms | " | 02/04/21 14:32  02/05/21 16:51 | " | |
| **Zinc** | **0.083** | 0.002 | 0.100 | " | " | icpms | " | 02/04/21 14:32  02/05/21 16:51 | " | J |

*The results in this report apply to the samples analyzed in accordance with the chain of custody document. This analytical report must be reproduced in its entirety.*



EnviroMatrix **EMA** Analytical, Inc.

| Client Name: | Coastal Environmental Rights Foundation | EMA Log #: 20L0905 |
|---|---|---|
| Project Name: | Stormwater | |

## Total Metals by EPA 200 Series Methods

| Analyte | Result | MDL | Reporting Limit | Units | Dilution | Analyst | Batch | Sample Prepared Sample Analyzed | Method | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| **Discovery (20L0905-04) Stormwater** | **Sampled: 12/30/20 11:25** | **Received: 12/30/20 12:33** | | | | | | | | |
| **Copper** | **0.008** | 0.0002 | 0.010 | mg/l | 1 | icpms | 1020495 | 02/04/21 14:32 02/05/21 15:37 | EPA 200.8 | J |
| **Iron** | **0.940** | 0.002 | 0.050 | " | " | icpms | " | 02/04/21 14:32 02/05/21 15:37 | " | |
| **Manganese** | **0.115** | 0.0001 | 0.005 | " | " | icpms | " | 02/04/21 14:32 02/05/21 15:37 | " | |
| **Lead** | **0.001** | 0.0001 | 0.005 | " | " | icpms | " | 02/04/21 14:32 02/05/21 15:37 | " | J |
| Selenium | ND | 0.004 | 0.005 | " | " | icpms | " | 02/04/21 14:32 02/05/21 15:37 | " | |
| **Zinc** | **0.028** | 0.0003 | 0.020 | " | " | icpms | " | 02/04/21 14:32 02/05/21 15:37 | " | |

*The results in this report apply to the samples analyzed in accordance with the chain of custody document. This analytical report must be reproduced in its entirety.*



EnviroMatrix **EMA** Analytical, Inc.

| Client Name: | Coastal Environmental Rights Foundation | EMA Log #:  20L0905 |
|---|---|---|
| Project Name: | Stormwater | |

## Conventional Chemistry Parameters by Standard/EPA Methods

| Analyte | Result | MDL | Reporting Limit | Units | Dilution | Analyst | Batch | Sample Prepared Sample Analyzed | Method | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| **Free Builders (20L0905-01) Stormwater** | **Sampled: 12/28/20 09:38  Received: 12/30/20 12:33** | | | | | | | | | |
| Nitrate/Nitrite as N | 1.55 | 0.02 | 0.10 | mg/l | 2 | UM | 1011256 | 01/19/21 15:00 01/19/21 15:52 | EPA 353.2 | |
| Phosphorus, Total | 2.01 | 0.10 | 0.25 | " | 5 | UM | 1011524 | 01/14/21 16:30 01/15/21 14:59 | EPA 365.1 | |
| Total Dissolved Solids | 146 | 1.0 | 20.0 | " | 1 | NP | 1010467 | 01/04/21 08:10 01/06/21 16:52 | SM2540 C | |
| Total Suspended Solids | 44.0 | 1.0 | 20.0 | " | " | NP | 1010440 | 01/04/21 08:14 01/05/21 15:19 | SM2540 D | |
| **SM Creek (20L0905-02) Stormwater** | **Sampled: 12/28/20 10:48  Received: 12/30/20 12:33** | | | | | | | | | |
| Nitrate/Nitrite as N | 0.54 | 0.009 | 0.05 | mg/l | 1 | UM | 1011256 | 01/19/21 15:00 01/19/21 15:52 | EPA 353.2 | |
| Phosphorus, Total | 0.28 | 0.02 | 0.05 | " | " | UM | 1011524 | 01/14/21 16:30 01/15/21 14:59 | EPA 365.1 | |
| Total Dissolved Solids | 76.0 | 1.0 | 20.0 | " | " | NP | 1010467 | 01/04/21 08:10 01/06/21 16:52 | SM2540 C | |
| Total Suspended Solids | 8.0 | 1.0 | 20.0 | " | " | NP | 1010440 | 01/04/21 08:14 01/05/21 15:19 | SM2540 D | J |
| **Discovery (20L0905-03) Stormwater** | **Sampled: 12/28/20 11:19  Received: 12/30/20 12:33** | | | | | | | | | |
| Nitrate/Nitrite as N | 1.36 | 0.009 | 0.05 | mg/l | 1 | UM | 1011256 | 01/19/21 15:00 01/19/21 15:52 | EPA 353.2 | |
| Phosphorus, Total | 0.53 | 0.02 | 0.05 | " | " | UM | 1011524 | 01/14/21 16:30 01/15/21 14:59 | EPA 365.1 | |
| Total Dissolved Solids | 337 | 1.0 | 20.0 | " | " | NP | 1010467 | 01/04/21 08:10 01/06/21 16:52 | SM2540 C | |
| Total Suspended Solids | 122 | 1.0 | 20.0 | " | " | NP | 1010440 | 01/04/21 08:14 01/05/21 15:19 | SM2540 D | |
| **Discovery (20L0905-04) Stormwater** | **Sampled: 12/30/20 11:25  Received: 12/30/20 12:33** | | | | | | | | | |
| Nitrate/Nitrite as N | 3.38 | 0.04 | 0.25 | mg/l | 5 | UM | 1011256 | 01/19/21 15:00 01/19/21 15:52 | EPA 353.2 | |
| Phosphorus, Total | 0.58 | 0.02 | 0.05 | " | 1 | UM | 1011524 | 01/14/21 16:30 01/15/21 14:59 | EPA 365.1 | |
| Total Dissolved Solids | 758 | 1.0 | 20.0 | " | " | NP | 1010467 | 01/04/21 08:10 01/06/21 16:52 | SM2540 C | |
| Total Suspended Solids | 26.0 | 1.0 | 20.0 | " | " | NP | 1010440 | 01/04/21 08:14 01/05/21 15:19 | SM2540 D | |

*The results in this report apply to the samples analyzed in accordance with the chain of custody document. This analytical report must be reproduced in its entirety.*



EnviroMatrix **EMA** Analytical, Inc.

| Client Name: | Coastal Environmental Rights Foundation | | EMA Log #:  20L0905 |
|---|---|---|---|
| Project Name: | Stormwater | | |

## Total Metals by EPA 200 Series Methods - Quality Control

| Analyte | Result | MDL | Reporting Limit | Units | Analyst | Spike Level | Source Result | %REC | %REC Limits | RPD | RPD Limit | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Batch 1020495** | | | | | | | | | | | | |
| **Blank (1020495-BLK1)** | | | | | Prepared: 02/04/21  Analyzed: 02/05/21 | | | | | | | |
| Lead | ND | 0.0001 | 0.005 | mg/l | icpms | | | | | | | |
| Manganese | ND | 0.0001 | 0.005 | " | icpms | | | | | | | |
| Iron | ND | 0.002 | 0.050 | " | icpms | | | | | | | |
| Selenium | ND | 0.004 | 0.005 | " | icpms | | | | | | | |
| Zinc | ND | 0.0003 | 0.020 | " | icpms | | | | | | | |
| Copper | ND | 0.0002 | 0.010 | " | icpms | | | | | | | |
| **LCS (1020495-BS1)** | | | | | Prepared: 02/04/21  Analyzed: 02/05/21 | | | | | | | |
| Lead | 0.103 | 0.0001 | 0.005 | mg/l | icpms | 0.100 | | 103 | 85-115 | | | |
| Selenium | 0.105 | 0.004 | 0.005 | " | icpms | 0.100 | | 105 | 75-125 | | | |
| Manganese | 0.104 | 0.0001 | 0.005 | " | icpms | 0.100 | | 104 | 85-115 | | | |
| Iron | 0.103 | 0.002 | 0.050 | " | icpms | 0.100 | | 103 | 85-115 | | | |
| Copper | 0.108 | 0.0002 | 0.010 | " | icpms | 0.100 | | 108 | 85-115 | | | |
| Zinc | 0.106 | 0.0003 | 0.020 | " | icpms | 0.100 | | 106 | 85-115 | | | |
| **LCS Dup (1020495-BSD1)** | | | | | Prepared: 02/04/21  Analyzed: 02/05/21 | | | | | | | |
| Manganese | 0.107 | 0.0001 | 0.005 | mg/l | icpms | 0.100 | | 107 | 85-115 | 3 | 20 | |
| Lead | 0.107 | 0.0001 | 0.005 | " | icpms | 0.100 | | 107 | 85-115 | 4 | 20 | |
| Selenium | 0.108 | 0.004 | 0.005 | " | icpms | 0.100 | | 108 | 75-125 | 3 | 20 | |
| Iron | 0.109 | 0.002 | 0.050 | " | icpms | 0.100 | | 109 | 85-115 | 6 | 20 | |
| Copper | 0.112 | 0.0002 | 0.010 | " | icpms | 0.100 | | 112 | 85-115 | 4 | 20 | |
| Zinc | 0.109 | 0.0003 | 0.020 | " | icpms | 0.100 | | 109 | 85-115 | 3 | 20 | |
| **Duplicate (1020495-DUP1)** | | | **Source: 20L0872-02** | | Prepared: 02/04/21  Analyzed: 02/05/21 | | | | | | | |
| Iron | 8.16 | 0.008 | 0.250 | mg/l | icpms | | 8.19 | | | 0.4 | 20 | |
| Selenium | ND | 0.019 | 0.025 | " | icpms | | ND | | | | 20 | |
| Copper | 0.055 | 0.001 | 0.050 | " | icpms | | 0.055 | | | 0.4 | 20 | |
| Zinc | 0.316 | 0.002 | 0.100 | " | icpms | | 0.316 | | | 0.1 | 20 | |
| Lead | 0.023 | 0.0005 | 0.025 | " | icpms | | 0.022 | | | 2 | 20 | J |
| Manganese | 0.172 | 0.0005 | 0.025 | " | icpms | | 0.169 | | | 2 | 20 | |

*The results in this report apply to the samples analyzed in accordance with the chain of custody document. This analytical report must be reproduced in its entirety.*



EnviroMatrix **EMA** Analytical, Inc.

| Client Name: | Coastal Environmental Rights Foundation | EMA Log #:  20L0905 |
|---|---|---|
| Project Name: | Stormwater | |

## Total Metals by EPA 200 Series Methods - Quality Control

| Analyte | Result | MDL | Reporting Limit | Units | Analyst | Spike Level | Source Result | %REC | %REC Limits | RPD | RPD Limit | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Batch 1020495** | | | | | | | | | | | | |
| **Matrix Spike (1020495-MS1)** | | | **Source: 20L0872-02** | | Prepared: 02/04/21  Analyzed: 02/05/21 | | | | | | | |
| Copper | 0.171 | 0.001 | 0.050 | mg/l | icpms | 0.100 | 0.055 | 117 | 70-130 | | | |
| Iron | 7.81 | 0.008 | 0.250 | " | icpms | 0.100 | 8.19 | NR | 70-130 | | | QM-05 |
| Lead | 0.129 | 0.0005 | 0.025 | " | icpms | 0.100 | 0.022 | 106 | 70-130 | | | |
| Selenium | 0.107 | 0.019 | 0.025 | " | icpms | 0.100 | ND | 107 | 75-125 | | | |
| Zinc | 0.427 | 0.002 | 0.100 | " | icpms | 0.100 | 0.316 | 111 | 70-130 | | | |
| Manganese | 0.273 | 0.0005 | 0.025 | " | icpms | 0.100 | 0.169 | 104 | 70-130 | | | |
| **Matrix Spike (1020495-MS2)** | | | **Source: 20L0905-04** | | Prepared: 02/04/21  Analyzed: 02/05/21 | | | | | | | |
| Iron | 0.955 | 0.002 | 0.050 | mg/l | icpms | 0.100 | 0.940 | 15 | 70-130 | | | QM-05 |
| Zinc | 0.131 | 0.0003 | 0.020 | " | icpms | 0.100 | 0.028 | 102 | 70-130 | | | |
| Lead | 0.108 | 0.0001 | 0.005 | " | icpms | 0.100 | 0.001 | 107 | 70-130 | | | |
| Copper | 0.112 | 0.0002 | 0.010 | " | icpms | 0.100 | 0.008 | 104 | 70-130 | | | |
| Manganese | 0.223 | 0.0001 | 0.005 | " | icpms | 0.100 | 0.115 | 108 | 70-130 | | | |
| Selenium | 0.112 | 0.004 | 0.005 | " | icpms | 0.100 | ND | 112 | 75-125 | | | |
| **Matrix Spike Dup (1020495-MSD1)** | | | **Source: 20L0872-02** | | Prepared: 02/04/21  Analyzed: 02/05/21 | | | | | | | |
| Iron | 7.60 | 0.008 | 0.250 | mg/l | icpms | 0.100 | 8.19 | NR | 70-130 | 3 | 20 | QM-05 |
| Manganese | 0.272 | 0.0005 | 0.025 | " | icpms | 0.100 | 0.169 | 103 | 70-130 | 0.2 | 20 | |
| Zinc | 0.427 | 0.002 | 0.100 | " | icpms | 0.100 | 0.316 | 111 | 70-130 | 0.1 | 20 | |
| Selenium | 0.107 | 0.019 | 0.025 | " | icpms | 0.100 | ND | 107 | 75-125 | 0.3 | 20 | |
| Lead | 0.131 | 0.0005 | 0.025 | " | icpms | 0.100 | 0.022 | 109 | 70-130 | 2 | 20 | |
| Copper | 0.170 | 0.001 | 0.050 | " | icpms | 0.100 | 0.055 | 115 | 70-130 | 0.8 | 20 | |

*The results in this report apply to the samples analyzed in accordance with the chain of custody document. This analytical report must be reproduced in its entirety.*



EnviroMatrix **EMA** Analytical, Inc.

| Client Name: | Coastal Environmental Rights Foundation | EMA Log #:  20L0905 |
|---|---|---|
| Project Name: | Stormwater | |

### Conventional Chemistry Parameters by Standard/EPA Methods - Quality Control

| Analyte | Result | MDL | Reporting Limit | Units | Analyst | Spike Level | Source Result | %REC | %REC Limits | RPD | RPD Limit | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Batch 1010440** | | | | | | | | | | | | |
| **Blank (1010440-BLK1)** | | | | | Prepared: 01/04/21  Analyzed: 01/05/21 | | | | | | | |
| Total Suspended Solids | ND | 1.0 | 20.0 | mg/l | NP | | | | | | | |
| **Duplicate (1010440-DUP1)** | | | **Source: 20L0905-04** | | Prepared: 01/04/21  Analyzed: 01/05/21 | | | | | | | |
| Total Suspended Solids | 24.0 | 1.0 | 20.0 | mg/l | NP | | 26.0 | | | 8 | 20 | |
| **Reference (1010440-SRM1)** | | | | | Prepared: 01/04/21  Analyzed: 01/05/21 | | | | | | | |
| Total Suspended Solids | 100 | 1.0 | 20.0 | mg/l | NP | 100 | | 100 | 77.1-110 | | | |
| **Batch 1010467** | | | | | | | | | | | | |
| **Blank (1010467-BLK1)** | | | | | Prepared: 01/04/21  Analyzed: 01/06/21 | | | | | | | |
| Total Dissolved Solids | ND | 1.0 | 20.0 | mg/l | NP | | | | | | | |
| **Duplicate (1010467-DUP1)** | | | **Source: 20L0865-01** | | Prepared: 01/04/21  Analyzed: 01/06/21 | | | | | | | |
| Total Dissolved Solids | 82.0 | 1.0 | 20.0 | mg/l | NP | | 90.0 | | | 9 | 20 | |
| **Reference (1010467-SRM1)** | | | | | Prepared: 01/04/21  Analyzed: 01/06/21 | | | | | | | |
| Total Dissolved Solids | 420 | 1.0 | 20.0 | mg/l | NP | 425 | | 99 | 89.41-110.58 | | | |
| **Batch 1011256** | | | | | | | | | | | | |
| **Blank (1011256-BLK1)** | | | | | Prepared & Analyzed: 01/19/21 | | | | | | | |
| Nitrate/Nitrite as N | ND | 0.009 | 0.05 | mg/l | UM | | | | | | | |
| **LCS (1011256-BS1)** | | | | | Prepared & Analyzed: 01/19/21 | | | | | | | |
| Nitrate/Nitrite as N | 0.49 | 0.009 | 0.05 | mg/l | UM | 0.500 | | 98 | 90-110 | | | |

*The results in this report apply to the samples analyzed in accordance with the chain of custody document. This analytical report must be reproduced in its entirety.*



**EnviroMatrix** **Analytical, Inc.**

| Client Name: | Coastal Environmental Rights Foundation | EMA Log #: 20L0905 |
|---|---|---|
| Project Name: | Stormwater | |

## Conventional Chemistry Parameters by Standard/EPA Methods - Quality Control

| Analyte | Result | MDL | Reporting Limit | Units | Analyst | Spike Level | Source Result | %REC | %REC Limits | RPD | RPD Limit | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Batch 1011256** | | | | | | | | | | | | |
| **LCS Dup (1011256-BSD1)** | | | | | Prepared & Analyzed: 01/19/21 | | | | | | | |
| Nitrate/Nitrite as N | 0.49 | 0.009 | 0.05 | mg/l | UM | 0.500 | | 98 | 90-110 | 0.2 | 20 | |
| **Duplicate (1011256-DUP1)** | | | **Source: 20L0809-01** | | Prepared & Analyzed: 01/19/21 | | | | | | | |
| Nitrate/Nitrite as N | 0.33 | 0.009 | 0.05 | mg/l | UM | | 0.34 | | | 0.3 | 20 | |
| **Matrix Spike (1011256-MS1)** | | | **Source: 20L0809-01** | | Prepared & Analyzed: 01/19/21 | | | | | | | |
| Nitrate/Nitrite as N | 1.32 | 0.02 | 0.10 | mg/l | UM | 1.00 | 0.34 | 99 | 90-110 | | | |
| **Matrix Spike Dup (1011256-MSD1)** | | | **Source: 20L0809-01** | | Prepared & Analyzed: 01/19/21 | | | | | | | |
| Nitrate/Nitrite as N | 1.32 | 0.02 | 0.10 | mg/l | UM | 1.00 | 0.34 | 98 | 90-110 | 0.5 | 20 | |
| **Batch 1011524** | | | | | | | | | | | | |
| **Blank (1011524-BLK1)** | | | | | Prepared: 01/14/21  Analyzed: 01/15/21 | | | | | | | |
| Phosphorus, Total | ND | 0.02 | 0.05 | mg/l | UM | | | | | | | |
| **LCS (1011524-BS1)** | | | | | Prepared: 01/14/21  Analyzed: 01/15/21 | | | | | | | |
| Phosphorus, Total | 0.50 | 0.02 | 0.05 | mg/l | UM | 0.500 | | 100 | 90-110 | | | |
| **LCS Dup (1011524-BSD1)** | | | | | Prepared: 01/14/21  Analyzed: 01/15/21 | | | | | | | |
| Phosphorus, Total | 0.50 | 0.02 | 0.05 | mg/l | UM | 0.500 | | 100 | 90-110 | 0.2 | 20 | |
| **Duplicate (1011524-DUP1)** | | | **Source: 20L0905-04** | | Prepared: 01/14/21  Analyzed: 01/15/21 | | | | | | | |
| Phosphorus, Total | 0.59 | 0.02 | 0.05 | mg/l | UM | | 0.58 | | | 0.9 | 20 | |
| **Matrix Spike (1011524-MS1)** | | | **Source: 20L0905-04** | | Prepared: 01/14/21  Analyzed: 01/15/21 | | | | | | | |
| Phosphorus, Total | 1.67 | 0.04 | 0.10 | mg/l | UM | 1.00 | 0.58 | 109 | 90-110 | | | |

*The results in this report apply to the samples analyzed in accordance with the chain of custody document. This analytical report must be reproduced in its entirety.*

 **EnviroMatrix** **Analytical, Inc.**

| Client Name: | Coastal Environmental Rights Foundation | EMA Log #:  20L0905 |
|---|---|---|
| Project Name: | Stormwater | |

## Conventional Chemistry Parameters by Standard/EPA Methods - Quality Control

| Analyte | Result | MDL | Reporting Limit | Units | Analyst | Spike Level | Source Result | %REC | %REC Limits | RPD | RPD Limit | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Batch 1011524** | | | | | | | | | | | | |
| **Matrix Spike Dup (1011524-MSD1)** | | | **Source: 20L0905-04** | | Prepared: 01/14/21 | Analyzed: 01/15/21 | | | | | | |
| Phosphorus, Total | 1.66 | 0.04 | 0.10 | mg/l | UM | 1.00 | 0.58 | 108 | 90-110 | 0.7 | 20 | |

*The results in this report apply to the samples analyzed in accordance with the chain of custody document. This analytical report must be reproduced in its entirety.*



EnviroMatrix  Analytical, Inc.

| Client Name: Coastal Environmental Rights Foundation | EMA Log #:  20L0905 |
| Project Name:   Stormwater | |

## Notes and Definitions

| | |
|---|---|
| QM-05 | The spike recovery was outside acceptance limits for the MS and/or MSD due to matrix interference. The LCS and/or LCSD were within acceptance limits showing that the laboratory is in control and the data is acceptable. |
| J | Detected but below the Reporting Limit; therefore, result is an estimated concentration (CLP J-Flag). |
| ND | Analyte NOT DETECTED at or above the reporting limit (or method detection limit when specified) |
| NR | Not Reported |
| dry | Sample results reported on a dry weight basis (if indicated in units column) |
| RPD | Relative Percent Difference |
| MDL | Method detection limit (indicated per client's request) |

*The results in this report apply to the samples analyzed in accordance with the chain of custody document. This analytical report must be reproduced in its entirety.*

EnviroMatrix  Analytical, Inc.

2010905

**EMA** — *EnviroMatrix* ——— *Analytical, Inc.*

6349 Vantage Ave. Ste. A • San Diego, CA 92121 • Phone (858) 560-7717 • Fax (858) 560-7703

## CHAIN-OF-CUSTODY RECORD

EMA LOG #:

Client: Coastal Environmental Rights Foundation

Attn: Livia Borak

Address: 1140 South Coast Highway 101

Encinitas CA 92024

Phone: 760-942-8505          Fax: 760-942-8515

Email: lborak@coastlaw.com

Billing Address: 1140 South Coast Highway 101

Encinitas CA 92024

Project #:

| ID# | Client Sample ID | Sample Date | Sample Time | Sample Matrix | Container # / Type |
|---|---|---|---|---|---|
| 1 | Free Builders | 12/28/2020 | 9:38 AM | SW | 250 mL HDPE/1 HNO3 |
| 2 | Free Builders | 12/28/2020 | 9:38 AM | SW | 250 mL HDPE/1 H2SO4 |
| 3 | Free Builders | 12/28/2020 | 9:38 AM | SW | 250mL HDPE/1 |
| 4 | SM Creek | 12/28/2020 | 10:48 AM | SW | 250 mL HDPE/1 HNO3 |
| 5 | SM Creek | 12/28/2020 | 10:48 AM | SW | 250 mL HDPE/1 H2SO4 |
| 6 | SM Creek | 12/28/2020 | 10:48 AM | SW | 250mL HDPE/1 |
| 7 | Discovery | 12/28/2020 | 11:15AM | SW | 250 mL HDPE/1 HNO3 |
| 8 | Discovery | 12/28/2020 | 11:15AM | SW | 250 mL HDPE/1 H2SO4 |
| 9 | Discovery | 12/28/2020 | 11:15AM | SW | 250mL HDPE/1 |
| 10 | Discovery | 12/30/2020 | 11:2 AM | SW | 250 mL HDPE/1 HNO3 |
| 11 | Discovery | 12/30/2020 | 11:2 AM | SW | 250 mL HDPE/1 H2SO4 |
| 12 | Discovery | 12/30/2020 | 11:2 AM | SW | 250ml HDPE/1 |
| 13 | | 12/30/2020 | | SW | 250 mL HDPE/1 HNO3 |
| | | 12/30/2020 | | SW | 250 mL HDPE/1 H2SO4 |
| | | | | SW | 250mL HDPE/1 |

Requested Analysis (EPA 200.7 Dissolved / Total)

**Matrix Codes:** A = Air, DW = Drinking Water, GW = Groundwater, SW = Storm Water
WW = Wastewater, S = Soil, SED = Sediment, SD = Solid, T = Tissue, O = Oil, L = Liquid

**Shipped By:** ☐ Courier ☐ UPS ☐ FedEx ☐ USPS ☒ Client Drop Off ☐ Other

**Turn-around-Time:** ☐ Same Day ☐ 1 day ☐ 2 day ☐ 3 day ☐ 4 day ☐ 5 day ☒ STD (7 business days)

**Reporting Requirements:** ☒ Fax ☒ PDF ☐ Excel ☐ Geotracker/EDF ☐ Hard Copy ☐ EDT ☐ EDEN ☐ Archive

**Sample Disposal:** ☒ By Laboratory ☐ Return to Client ☐ PU or Delivery ☐ Archive

Sample Integrity

| | | |
|---|---|---|
| Correct Containers | ☐ Yes ☐ No | |
| Custody Seals Intact | Yes ☐ No | Containers Properly Preserved ☐ Yes ☐ No ☐ N/A |
| COC Labels Agree | ☒ Yes ☐ No | Temp. of Receipt |
| | | Sampled By: ☒ Client ☐ EMA Autosampler |

Project/Sample Location/Address:

**RELINQUISHED BY**

Signature
Print Livia Borak/Print

**RECEIVED BY**

Signature
Print Bridget Mendville
Company EMA

DATE/TIME
12/30/2020
12:33 PM

Project/Sample Comments:

**Exhibit 3: Precipitation Data for Free Builders Supply, Inc. Facility**
National Oceanic & Atmospheric Administration
National Environmental Satellite, Data, and Information Service
Record of Climatological Observations
Station: SAN MARCOS 2.5 ENE, CA US
Location Elev: 1140 ft., Lat: 33.1472° N, Lon: -117.1316° W

| Date | Daily Precipitation (inches) | Date | Daily Precipitation (inches) |
|---|---|---|---|
| 2/19/2016 | 0.02 | 1/6/2017 | 0.32 |
| 3/6/2016 | 0.08 | 1/10/2017 | 0.3 |
| 3/7/2016 | 0.51 | 1/11/2017 | 0.06 |
| 3/12/2016 | 0.25 | 1/12/2017 | 0.13 |
| 3/14/2016 | 0.06 | 1/13/2017 | 0.75 |
| 3/28/2016 | 0.01 | 1/19/2017 | 0.49 |
| 3/29/2016 | 0.04 | 1/20/2017 | 0.49 |
| 4/8/2016 | 0.4 | 1/21/2017 | 1.54 |
| 4/9/2016 | 0.02 | 1/22/2017 | 0.02 |
| 4/10/2016 | 0.42 | 1/23/2017 | 1.96 |
| 4/30/2016 | 0.01 | 1/24/2017 | 0.33 |
| 5/1/2016 | 0.09 | 2/6/2017 | 0.02 |
| 5/6/2016 | 0.28 | 2/7/2017 | 0.18 |
| 5/7/2016 | 0.21 | 2/12/2017 | 0.13 |
| 5/25/2016 | 0.02 | 2/18/2017 | 1.43 |
| 9/21/2016 | 0.28 | 2/19/2017 | 0.24 |
| 9/22/2016 | 0.04 | 2/27/2017 | 0.61 |
| 10/18/2016 | 0.04 | 2/28/2017 | 3.6 |
| 11/21/2016 | 0.56 | 3/6/2017 | 0.11 |
| 11/22/2016 | 0.05 | 3/22/2017 | 0.02 |
| 11/27/2016 | 0.56 | 3/23/2017 | 0.04 |
| 11/28/2016 | 0.05 | 4/19/2017 | 0.01 |
| 12/16/2016 | 1.05 | 5/7/2017 | 0.63 |
| 12/17/2016 | 0.82 | 5/8/2017 | 0.83 |
| 12/21/2016 | 0.08 | 5/16/2017 | 0.04 |
| 12/22/2016 | 0.65 | 6/1/2017 | 0.02 |
| 12/23/2016 | 0.22 | 6/11/2017 | 0.01 |
| 12/24/2016 | 1.2 | 7/25/2017 | 0.06 |
| 12/25/2016 | 0.01 | 9/9/2017 | 0.03 |
| 12/31/2016 | 0.12 | 9/22/2017 | 0.02 |
| 1/1/2017 | 0.69 | 11/19/2017 | 0.02 |
| 1/2/2017 | 0.02 | 1/9/2018 | 1.35 |
| 1/3/2017 | 0.03 | 1/10/2018 | 1.65 |
| 1/5/2017 | 0.03 | 2/12/2018 | 0.04 |

**Exhibit 3: Precipitation Data for Free Builders Supply, Inc. Facility**

| Date | Daily Precipitation (inches) | Date | Daily Precipitation (inches) |
|---|---|---|---|
| 2/19/2018 | 0.02 | 2/10/2019 | 0.03 |
| 2/23/2018 | 0.13 | 2/14/2019 | 1.87 |
| 2/27/2018 | 0.53 | 2/15/2019 | 1.88 |
| 2/28/2018 | 0.1 | 2/16/2019 | 0.19 |
| 3/3/2018 | 0.11 | 2/18/2019 | 0.1 |
| 3/11/2018 | 0.63 | 2/19/2019 | 0.05 |
| 3/14/2018 | 0.2 | 2/20/2019 | 0.04 |
| 3/15/2018 | 0.45 | 2/21/2019 | 0.26 |
| 3/23/2018 | 0.15 | 2/22/2019 | 0.18 |
| 5/2/2018 | 0.01 | 3/2/2019 | 0.2 |
| 5/3/2018 | 0.06 | 3/3/2019 | 0.06 |
| 5/20/2018 | 0.01 | 3/6/2019 | 0.2 |
| 5/21/2018 | 0.01 | 3/12/2019 | 0.38 |
| 5/24/2018 | 0.09 | 3/13/2019 | 0.03 |
| 5/30/2018 | 0.01 | 3/21/2019 | 0.24 |
| 10/4/2018 | 0.26 | 4/3/2019 | 0.18 |
| 10/13/2018 | 0.45 | 4/29/2019 | 0.08 |
| 11/22/2018 | 0.28 | 5/1/2019 | 0.28 |
| 11/23/2018 | 0.08 | 5/7/2019 | 0.15 |
| 11/30/2018 | 1.43 | 5/12/2019 | 0.15 |
| 12/2/2018 | 0.04 | 5/20/2019 | 0.69 |
| 12/6/2018 | 0.82 | 5/22/2019 | 0.02 |
| 12/7/2018 | 0.96 | 5/27/2019 | 0.25 |
| 12/26/2018 | 0.65 | 6/17/2019 | 0.02 |
| 1/6/2019 | 0.57 | 6/18/2019 | 0.01 |
| 1/12/2019 | 0.21 | 9/5/2019 | 0.12 |
| 1/13/2019 | 0.51 | 9/27/2019 | 0.02 |
| 1/15/2019 | 0.21 | 9/29/2019 | 0.27 |
| 1/16/2019 | 0.79 | 11/20/2019 | 1.54 |
| 1/17/2019 | 0.08 | 11/21/2019 | 0.51 |
| 1/18/2019 | 0.21 | 11/28/2019 | 0.4 |
| 1/21/2019 | 0.04 | 11/29/2019 | 1.95 |
| 2/1/2019 | 0.92 | 11/30/2019 | 0.19 |
| 2/2/2019 | 0.06 | 12/4/2019 | 0.35 |
| 2/3/2019 | 1.1 | 12/5/2019 | 1.22 |
| 2/4/2019 | 0.15 | 12/7/2019 | 0.08 |
| 2/5/2019 | 0.59 | 12/8/2019 | 0.04 |

**Exhibit 3: Precipitation Data for Free Builders Supply, Inc. Facility**

| Date | Daily Precipitation (inches) |
|---|---|
| 12/24/2019 | 0.92 |
| 12/26/2019 | 1.36 |
| 12/27/2019 | 0.4 |
| 1/17/2020 | 0.24 |
| 1/21/2020 | 0.41 |
| 2/3/2020 | 0.04 |
| 2/10/2020 | 0.38 |
| 2/23/2020 | 0.34 |
| 3/2/2020 | 0.04 |
| 3/10/2020 | 0.66 |
| 3/11/2020 | 0.44 |
| 3/12/2020 | 0.1 |
| 3/13/2020 | 1.75 |
| 3/17/2020 | 0.7 |
| 3/18/2020 | 0.03 |
| 3/19/2020 | 0.9 |
| 3/23/2020 | 0.57 |
| 3/25/2020 | 0.08 |
| 3/26/2020 | 0.3 |
| 3/27/2020 | 0.08 |
| 4/6/2020 | 0.2 |
| 4/7/2020 | 1.2 |
| 4/8/2020 | 0.47 |
| 4/9/2020 | 0.28 |
| 4/10/2020 | 1.29 |
| 4/11/2020 | 3.2 |
| 4/13/2020 | 0.09 |
| 4/18/2020 | 0.02 |
| 5/11/2020 | 0.03 |
| 6/6/2020 | 0.01 |
| 6/7/2020 | 0.02 |
| 6/29/2020 | 0.06 |
| 6/30/2020 | 0.03 |
| 10/26/2020 | 0.04 |
| 11/7/2020 | 0.04 |
| 11/8/2020 | 0.4 |
| 11/9/2020 | 0.12 |

| Date | Daily Precipitation (inches) |
|---|---|
| 12/28/2020 | 0.2 |
| 12/29/2020 | 1.05 |
| 1/20/2021 | 0.02 |
| 1/23/2021 | 0.15 |
| 1/24/2021 | 0.52 |
| 1/25/2021 | 0.45 |
| 1/26/2021 | 0.26 |
| 1/29/2021 | 0.87 |
| 2/13/2021 | 0.51 |
| 2/16/2021 | 0.21 |
| 3/4/2021 | 0.71 |
| 3/10/2021 | 0.18 |
| 3/11/2021 | 0.61 |
| 3/13/2021 | 0.03 |
| 3/15/2021 | 0.01 |
| 3/16/2021 | 0.18 |